No. 96-259

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 219

DAVID T. DAWSON,

Petitioner,

v..

STATE OF MONTANA,

Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Montana Appellate Defender's Office, Helena, Montana

Kathryn Lund Ross, Attorney at Law, Seattle, Washington

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Pamela P. Collins,

Assistant Attorney General; Helena, Montana

Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Argued: September 4, 1997

Submitted: August 18, 1999

Decided: August 15, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Petitioner, David Dawson, was convicted of one count of robbery, four counts of aggravated kidnaping, and three counts of deliberate homicide following trial by jury in the District Court for the Thirteenth Judicial District in Yellowstone County on February 28, 1987. On April 15, 1987, he was sentenced to death for each of the three counts of aggravated kidnaping which resulted in the death of the victim. His conviction was appealed to this Court and affirmed in *State v. Dawson* (1988), 233 Mont. 345, 761 P.2d 352, *cert. denied*, *Dawson v. Montana* (1989), 491 U.S. 910, 109 S. Ct. 3200.

¶2 On January 16, 1991, Dawson filed a petition for postconviction relief pursuant to § 46-21-101, MCA, in the District Court in which he was convicted. On March 25, 1991, Dawson filed an amended petition for postconviction relief. In that petition, he claimed 30 separate grounds for relief. All but one claim, ineffective assistance of counsel, were dismissed by the District Court by summary judgment. On August 5, 1993, following withdrawal of his appellate counsel, Jeff Renz, Dawson filed a second amended petition for postconviction relief which added a 31st ground for relief: ineffective assistance of appellate counsel. Following an evidentiary hearing, the District Court denied Dawson's second amended petition for postconviction relief on February 7, 1996.

¶3 Dawson appeals from the District Court's orders which granted partial summary judgment of his amended petition for postconviction relief and denied his second amended petition for postconviction relief. We affirm the District Court.

¶4 The following issues are presented on appeal:

¶5 1. Did the District Court err when it held that Dawson did not receive ineffective

assistance of counsel during the pretrial phase?

¶6 2. Did the District Court err when it held that Dawson did not receive ineffective assistance of counsel during the trial phase?

¶7 3. Did the District Court err when it held that Dawson did not receive ineffective assistance of counsel during the sentencing phase?

¶8 4. Did the District Court err when it held that Dawson did not receive ineffective assistance of counsel during the direct appeal phase?

¶9 5. Did the District Court err when it denied Dawson's claims 1-29 by summary judgment?

¶10 6. Should this Court reconsider issues in a postconviction proceeding which were previously decided on direct appeal?

## PROCEDURAL BACKGROUND

¶11 The Petitioner, David Dawson, raised the following claims as violations of his constitutional and statutory rights in his amended petition for postconviction relief:

1. The District Court failed to appoint a psychiatrist to assist the defense.

2. The District Court ordered that the mental health experts appointed in response to the defense request for a mental examination, report to the court and prosecutor as well as the defense.

3. The District Court limited the mental examination to competency and mental issues related to guilt.

4. The state employed psychiatrist and psychologist failed to warn Dawson that he could remain silent and that his statements and test results could be used against him.

5. The state employed psychiatrist and psychologist failed to warn Dawson that the interview would exceed the scope of the court's order.

6. The state employed psychiatrist and psychologist failed to warn Dawson that he

had the right to have counsel present during the history taking and testing phases of the mental evaluation.

7. The prosecutor used the testimony of the court-appointed psychologist at the guilt phase of the trial to establish the petitioner's mental state and lack of remorse.

8. The District Court relied on the mental health report and testimony of the state employed psychologist, Dr. Van Hassel, in finding the non-statutory aggravating factor of lack of remorse.

9. Section 46-14-401, MCA (1985), as applied to Dawson, is unconstitutional.

10. The State failed to preserve mitigating or exculpatory evidence by waiting to draw Dawson's bodily fluids until 12 hours following his arrest.

11. The state probation officer failed to advise Dawson that he did not have to submit to the pre-sentence interview, and that anything he said could be used against him during sentencing.

12. The pre-sentence report failed to comply with the requirements of §§ 46-18-111, and -112 (1985), MCA.

13. The District Court failed to give weight to non-statutory mitigating circumstances.

14. The District Court failed to consider the mitigating circumstances as a whole.

15. The District Court failed to consider the mitigating circumstances as a whole when comparing the mitigating circumstances with the aggravating factors.

16. Section 46-18-305, MCA (1985), as applied to Dawson, is unconstitutional.

17. The District Court failed to consider other mitigating circumstances of which there was substantial evidence in the record of their existence.

18. The District Court and the Supreme Court interpreted § 46-18-303, MCA (1985), the statute which enumerates the aggravating factors, too broadly.

19. The District Court imposed the sentence of death as a result of passion and prejudice.

20. The District Court failed to make independent findings of fact and conclusions of law.

21. The District Court's findings establish that the District Court believed the crime to be so serious that it could never find that any evidence of mitigating circumstances would be sufficient to warrant leniency.

22. The District Court reacted emotionally to the testimony of Amy Rodstein in the presence of the jury.

23. The sentence of death by hanging is unconstitutional.

24. The District Court failed to provide Dawson with a jury trial on the issue of whether there were aggravating circumstances.

25. The District Court erred when it concluded that Dawson was not subject to rehabilitation.

26. The District Court erred when it concluded that Dawson would be a danger to others in the future.

27. The State failed to disclose evidence and used inaccurate testimony at the trial and sentencing hearing.

28. The District Court erred when it precluded the testimony of relevant defense witnesses.

29. The prosecutor made improper comments during closing argument.

30. Dawson was denied effective assistance of counsel by his trial counsel.

¶12 On May 20, 1991, the State filed a motion for partial summary judgment based on its contention that Dawson's claims 1-29 were procedurally barred, either by res judicata or by § 46-21-105(2), MCA. The District Court granted the State's motion for partial

summary judgment on September 16, 1992. On March 15, 1993, Dawson's appellate counsel, Jeff Renz, requested and was granted permission to withdraw as Dawson's appellate counsel. Following Renz's withdrawal, Dawson requested and was granted leave to file a second amended petition for postconviction relief. Dawson filed his second amended petition on August 5, 1993, which added the following claim to his previous 30 claims for relief:

31. Dawson was denied effective assistance of counsel by his appellate counsel for failing to raise petitioner's claims 1 - 29, inclusive, as issues on petitioner's direct appeal.

¶13 On October 5, 1992, Dawson filed a motion for reconsideration of the District Court's order granting partial summary judgment based on his contention that 9 of the 29 claims dismissed by partial summary judgment, required the presentation of evidence which was not part of the record of the first trial in this case and could not reasonably have been raised on direct appeal and, therefore, were not subject to the procedural bar of § 46-21-105(2), MCA. On January 26, 1993, the District Court denied Dawson's motion for reconsideration.

¶14 On February 14 and 15, 1994, the District Court conducted an evidentiary hearing pursuant to § 46-21-201, MCA, to consider the claims set forth in Dawson's second amended petition for postconviction relief. Several witnesses testified at the hearing, however, the District Court refused to consider four affidavits submitted by Dawson in support of his position.

¶15 On February 8, 1996, the District Court entered its findings of fact, conclusions of law, and order denying Dawson's second amended petition for postconviction relief. Dawson filed a notice of appeal with this Court on April 5, 1996. On appeal, one of Dawson's contentions was that the District Court erred when it refused to consider the four affidavits he submitted in support of his petition for postconviction relief. On December 12, 1997, without deciding the merits of Dawson's appeal, we entered an order which required the District Court to accept and consider Dawson's four affidavits and any affidavits the State might file in response. Following consideration of the affidavits, we ordered the District Court to issue any additional findings it deemed necessary along with a memorandum stating the effect the additional evidence had on its prior decision.

¶16 On March 8, 1999, the District Court entered its additional findings of fact, conclusions of law, and order in response to our order. Following its consideration of the new evidence, the District Court again denied Dawson's petition for postconviction relief.

¶17 Specific facts which served as the basis for the Petitioner's conviction and his sentence to death will be discussed where appropriate to the issues we now consider.

DISCUSSION

STANDARD OF REVIEW

¶18 We review a district court's denial of a petition for postconviction relief to determine whether the district court's findings are clearly erroneous and whether its conclusions of law are correct. *Bone v. State* (1997), 284 Mont. 293, 302, 944 P.2d 734, 739-40. When reviewing the district court's findings of fact to determine if they are clearly erroneous, we apply the following criteria:

> (1) the Court will determine whether the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, the Court will determine if the trial court has misapprehended the evidence; and (3) if the findings are supported by substantial evidence and that evidence has not been misapprehended, this Court may still find a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed.

*Bone, 284 Mont. at 302-03, 944 P.2d at 740 (citations omitted).*

¶19 With respect to his claims of ineffective assistance of counsel, Dawson argues that the proper standard of review is a de novo review of the District Court's decision. Dawson asserts that because a claim for ineffective assistance of counsel presents a mixed question of law and fact, this Court must conduct a de novo review. However, there is no authority in Montana which supports Dawson's position. To the contrary, in *Bone*, we applied the standard of review previously set forth, to Bone's claims of ineffective assistance of counsel. *Bone*, 284 Mont. at 302-03, 944 P.2d at 740. Accordingly, we will apply the standard of review set forth in *Bone* to Dawson's claims of ineffective assistance of counsel.

¶20 A petitioner seeking to reverse a district court's denial of a petition for postconviction relief based on a claim of ineffective assistance of counsel bears a heavy burden. *See Brown v. State* (1996), 277 Mont. 430, 434, 922 P.2d 1146, 1148. In considering

ineffective assistance of counsel claims on direct appeal and in postconviction proceedings, we apply the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S. Ct. 2052. *See Hagen v. State*, 1999 MT 8, ¶ 10, 293 Mont. 60, ¶ 10, 973 P.2d 233, ¶ 10. *Strickland's* two-part test requires that the defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Pursuant to *Strickland*, a defendant alleging ineffective assistance of counsel must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

¶21 In *Strickland*, the Supreme Court also stated:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.*

## ISSUE 1

¶22 Did the District Court err when it held that Dawson did not receive ineffective assistance of counsel during the pretrial phase?

¶23 Dawson asserts that his defense counsel, John Adams, Allen Beck, and Gary Wilcox, rendered ineffective assistance during the pretrial phase. First, Dawson asserts that his counsel were ineffective because they failed to object to the procedure and subsequent use of Dawson's psychiatric evaluation at Montana State Hospital. Second, Dawson contends that his counsel were ineffective for their failure to advise him of his rights during the psychiatric evaluation process or to otherwise protect those rights. Third, Dawson asserts

that his counsel were ineffective for their failure to conduct an adequate pretrial investigation.

### a. Failure to object to the preparation and use of the Montana State Hospital psychiatric evaluation.

¶24 Dawson asserts that the District Court erred when it concluded that his counsel did not render ineffective assistance when they failed to object to the methods used to prepare and subsequently disseminate the Montana State Hospital psychiatric evaluation to the District Court and the State, as well as the defense. Dawson contends that his counsel failed to secure the confidential psychiatric evaluation and assistance to which he was entitled pursuant to *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S. Ct. 1087.

¶25 In response, the State contends that Dawson's counsel's actions were in accord with §§ 46-14-201 to -213, MCA (1985), the relevant Montana statutory scheme in effect at the time of Dawson's counsel's request for the mental health evaluation, and at the time of Dawson's trial. Additionally, the State asserts that Dawson's counsel's actions were in accord with the Montana Supreme Court's recent decision at that time in *State v. Smith* (1985), 217 Mont. 453, 705 P.2d 1110, which was based on the *Ake* decision, and upheld Montana's statutory scheme. The State argues that the 1990 interpretation of *Ake* by the Ninth Circuit Court of Appeals in *Smith v. McCormick* (9th Cir. 1990), 914 F.2d 1153, is not a valid basis for an ineffective assistance claim, because it would require this Court to judge the actions of Dawson's counsel on the basis of hindsight.

¶26 In concluding that Dawson's counsel did not render ineffective assistance of counsel for failing to object to the psychiatric evaluation procedure, the District Court found that Dawson's counsel acted appropriately according to the status of the law at that time.

¶27 The relevant statutory scheme in April 1986, at the time Dawson's psychiatric evaluation was ordered, included the following relevant provisions:

**46-14-202. Psychiatric examination of defendant. (1) If the defendant or his counsel files a written notice of his intent to rely on a mental disease or defect under 46-14-201 or raises the issue of his fitness to proceed, the court shall appoint at least one qualified psychiatrist or shall request the superintendent of the Montana state hospital to designate at least one qualified psychiatrist, which designation may be or include himself, to examine and report upon the mental condition of the defendant.**

. . . .

**46-14-203. Report of the examination.** (1) The report of the examination shall include the following:

(a) a description of the nature of the examination;

(b) a diagnosis of the mental condition of the defendant;

(c) if the defendant suffers from a mental disease or defect, an opinion as to his capacity to understand the proceedings against him and to assist in his own defense; and

(d) when directed by the court, an opinion as to the capacity of the defendant to have a particular state of mind which is an element of the offense charged.

. . . .

(3) The report of the examination shall be filed in triplicate with the clerk of court, who shall deliver copies to the county attorney and to counsel for the defendant.

. . . .

**46-14-213. Psychiatric testimony upon trial.** (1) Upon the trial, any psychiatrist who reported under 46-14-202 and 46-14-203 may be called as a witness by the prosecution or by the defense . . . .

(2) When a psychiatrist or other expert who has examined the defendant testifies concerning the defendant's mental condition, he may make a statement as to the nature of his examination, his diagnosis of the mental condition of the defendant at the time of the commission of the offense charged, and his opinion as to the ability of the defendant to have a particular state of mind which is an element of the offense charged.

The procedure followed and the use of Dawson's psychiatric evaluation were consistent with the statutory procedure in effect at that time.

¶28 Nevertheless, Dawson argues that, regardless of Montana's statutory scheme, pursuant

to the United States Supreme Court's decision in *Ake*, he was entitled to an evaluation by an independent psychiatrist who would "assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096. Moreover, Dawson asserts that, pursuant to *Ake*, his counsel were ineffective for not objecting to the procedure because the evaluation he received was available for use by both the prosecution and the defense, and because it was done by a neutral psychiatrist, rather than one assigned to assist solely in his defense.

¶29 In *Ake*, the United States Supreme Court held as follows:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Ake, 470 U.S. at 83, 105 S. Ct. at 1096. Additionally, the Supreme Court, in Ake, referred to the Montana statutory scheme in a footnote to the following sentence:*

> Many States, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants, and they have not found the financial burden so great as to preclude this assistance.

*Ake, 470 U.S. at 79, 105 S. Ct. at 1094.*

¶30 Finally, this Court's decision in *State v. Smith* (1985), 217 Mont. 453, 705 P.2d 1110, while distinguishing *Ake* on several grounds, concluded that Smith was afforded the rights set forth in *Ake,* through the appointment of a neutral psychiatrist. Although the Ninth Circuit Court subsequently concluded, in *Smith v. McCormick* (9th Cir. 1990), 914 F.2d 1153, that our holding in *State v. Smith* did not satisfy due process as contemplated in *Ake*, that opinion was not issued until 1990, four years after Dawson's evaluation and three years after his trial.

¶31 In *Strickland*, the United States Supreme Court stated:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.*

¶32 We conclude that at the time of Dawson's evaluation it was reasonable for Dawson's counsel to believe that Montana's statutory scheme was consistent with the *Ake* decision. Additionally, because there was no language in *Ake* which addressed the dissemination or utilization of the psychiatric evaluation, Dawson's counsel had no reason to question Montana's statutory scheme in that regard. Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel did not render ineffective assistance of counsel because they failed to object to the procedures for and use of Dawson's psychiatric evaluation.

¶33 It is also important to note that Dawson did have access to a second mental health expert, Dr. John Watkins, who was chosen by Dawson. Dr. Watkins was an independent psychiatrist, who was appointed prior to trial solely to assist the defense and none of the information developed through or by Dr. Watkins was furnished to the State or the District Court.

b. Failure to advise Dawson of his rights during the Montana State Hospital evaluation and to ensure that Dawson's rights were protected.

¶34 Dawson argues that the District Court erred when it concluded that his counsel did not render ineffective assistance when they failed to advise him of his rights during the Montana State Hospital evaluation and to ensure that his rights were protected. First, Dawson asserts that his counsel should have informed him of his *Miranda* rights. Second, Dawson argues that his counsel should not have advised him to cooperate during his psychiatric evaluation. Third, Dawson argues that his counsel should have informed him of his right to counsel during his psychiatric evaluation. Fourth, Dawson asserts that his counsel should have objected to the testimony of Dr. Van Hassel in the State's case-in-chief.

¶35 The District Court concluded that these issues "were handled appropriately from the

perspective of counsel at the time with the status of the law at the time." The District Court based its conclusion on the following:

> [D]efense counsel appropriately recognized that there might be mental health issues in the case and that an evaluation of their client should be completed to determine whether there was an existing mental disease or defect which would preclude the defendant from appropriately participating in his defense or having a sufficient state of mind to be determined guilty of the offense. The evaluation could have benefitted Dawson. The fact that the evaluation ultimately did not benefit him could not necessarily have been anticipated at the time of the examinations.

¶36 First, Dawson argues that his counsel rendered ineffective assistance because they failed to advise him of his *Miranda* rights during the psychiatric evaluation, including his privilege against self-incrimination, his right to remain silent during the evaluation, and that anything he said could be used against him during the sentencing phase.

¶37 Recently, in *Hans v. State* (1997), 283 Mont. 379, 942 P.2d 674, we addressed this same issue. In *Hans*, we concluded that, although pursuant to *State v. Smith* (1993), 261 Mont. 419, 427-28, 863 P.2d 1000, 1004-05, a defendant has no constitutional right to be informed of his *Miranda* rights when, through his attorney he has requested a psychiatric exam, defense counsel has a duty to inform his client of the consequences of his participation in the evaluation. *Hans,* 283 Mont. at 402-03, 942 P.2d at 688. In *Hans*, we concluded that our determination that *Miranda* warnings were not necessary in *Smith*, was based on our assumption that, before requesting an evaluation, counsel will provide advice regarding the potential consequences of participating in an evaluation. *Hans,* 283 Mont. at 403, 942 P.2d at 688.

¶28 Because our review of the record reveals no evidence that Dawson's defense counsel informed him of the potential consequences of participating in the psychiatric evaluation, we must conclude that Dawson has satisfied the deficiency prong of the *Strickland* test for ineffective assistance counsel.

¶29 We must next address the second prong of the *Strickland* test which requires that counsel's deficiency prejudiced Dawson. Because all of the statements made by Dawson during his psychiatric evaluation concerning how the incident occurred were the subject of a successful motion in limine, and protected by § 46-14-401, MCA (1985), and were therefore not inquired into at trial, we conclude that Dawson can show no prejudice during

the trial phase.

¶30 However, because Dawson's statements were admissible and available to be considered by the District Court during the sentencing phase, we must also inquire as to any possible prejudice at this phase. Our review of the record reveals that no additional testimony was offered by the State regarding Dawson's psychiatric evaluation. Thus, the court-ordered psychiatric report prepared by Dr. Van Hassel was the only additional evidence regarding Dawson's psychiatric evaluation which the District Court may have considered during sentencing. However, there was no indication that the District Court relied on the report during sentencing to determine any of its findings or conclusions.

¶31 Additionally, our review of the report itself reveals no information which may have prejudiced Dawson at the sentencing proceeding. To the contrary, Dawson's version of the crimes was consistent with his defense theory that he was under the control of another person, and at no time did Dawson admit to causing the deaths of any of the Rodsteins. Accordingly, we conclude that Dawson's counsel's failure to advise him of his *Miranda* rights did not prejudice him at the sentencing phase.

¶32 Second, Dawson asserts that his counsel were ineffective because they advised him to cooperate during his psychiatric evaluation.

¶33 At the time of Dawson's psychiatric evaluation, Dawson had the benefit of the following statute:

> **46-14-401. Admissibility of statements made during examination or treatment.** **A statement made for the purposes of psychiatric examination or treatment provided for in this chapter by a person subjected to such examination or treatment is not admissible in evidence against him in any criminal proceeding, except a sentencing hearing conducted under 46-14-311, on any issue other than that of his mental condition. It is admissible on the issue of his mental condition, whether or not it would otherwise be considered a privileged communication, unless it constitutes an admission of guilt of the crime charged. In a hearing held under 46-14-311, the court may hear and consider any such statement even if it constitutes an admission of guilt.**
>
> Section 46-14-401, MCA (1985). Additionally, Dawson's counsel made a successful motion in limine to assure that none of Dawson's statements were admitted at trial.

¶44 Based on the statutory and procedural protections available to Dawson, with regard to any statements made during his psychiatric examination, we conclude that Dawson's

counsel's action of advising Dawson to cooperate during the psychiatric evaluation, does not fall below an objective standard of reasonableness. Dawson's counsel believed, at the time, that the psychiatric evaluation would benefit him, and thus Dawson's cooperation in that process would be an advantage to him, and so advised him.

¶45 Third, Dawson contends that his counsel were ineffective because they failed to advise him that he could have counsel present during the psychiatric evaluation.

¶46 In *Smith v. Estelle* (5th Cir. 1979), 602 F.2d 694, 708, the court stated that "a defendant has no constitutional right to have an attorney present during a psychiatric evaluation of his dangerousness," following *United States v. Cohen* (5th Cir. 1976), 530 F.2d 43, 48, in which the court held that there was no right to have an attorney present when the examination was to decide if the defendant was sane.

¶47 In *State v. Armfield* (1984), 214 Mont. 229, 233, 693 P.2d 1226, 1229, we held that a defendant is:

> [E]ntitled to (1) the pretrial presence of counsel where the incident or encounter is a "critical stage" in the prosecutorial proceedings, and (2) the assistance of counsel at any stage in the pretrial proceedings where the advice of counsel is essential to the protection of his Fifth Amendment privilege against self-incrimination.

(Citations omitted.)

¶48 Notwithstanding the fact that there is no authority for Dawson's contention that he had a constitutional right to have counsel present during the evaluation, with the statutory protection afforded by § 46-14-401, MCA (1985), it was reasonable for Dawson's counsel to believe that it was not necessary that he have counsel present during the evaluation itself.

¶49 Finally, Dawson argues that his counsel should have objected to the testimony of Dr. Van Hassel, the person who examined him, when he was called as a witness by the State. Dawson contends that he did not waive his Fifth Amendment right against self-incrimination and, therefore, the State could only offer psychiatric evidence in rebuttal, not as a part of its direct evidence. Additionally, Dawson asserts that he had effectively withdrawn the defense of mental disease or defect and, therefore, Dr. Van Hassel could not be called to testify by the State.

¶50 The State points to the relevant statute at the time of Dawson's trial:

> **46-14-213. Psychiatric testimony upon trial.** (1) Upon the trial, any psychiatrist who reported under 46-14-202 and 46-14-203 *may be called as a witness by the prosecution* or by the defense . . . .

> Section 46-14-213, MCA (1985) (emphasis added). Clearly, the statute in effect at that time provided that the psychiatrist who performed the evaluation may be called as a witness for the State, and did not limit that provision to the State's rebuttal.

¶51 As for Dawson's argument that he had effectively withdrawn the defense of mental disease or defect, we note the following testimony from defense counsel Allen Beck at the evidentiary hearing to consider Dawson's petition for postconviction relief:

> Q. [By the Court] But in a legal sense, if the facts were to change during the course of a trial, you still could have made use of that defense; is that correct:

> A. Yes, I intentionally preserved it.

¶52 The District Court found that: "[u]nder the law at the time as appropriately understood by all parties the testimony of the mental health examiner was admissible to establish Dawson's state of mind."

¶53 Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel, based on the law at that time, acted reasonably when they did not object to the testimony of Dr. Van Hassel.

¶54 Additionally, Dawson argues that his counsel should have provided his psychiatric evaluator with information regarding Dawson's use of drugs and alcohol, and any other information which would have assisted the staff.

¶55 However, our review of the Montana State Hospital report reveals that Dawson provided the hospital staff with information regarding his use of alcohol and drugs and other pertinent information. Therefore, Dawson is unable to establish any prejudice based on his counsel's failure to provide information to the hospital staff. Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel did not

render ineffective assistance because they failed to provide the hospital staff with information concerning Dawson.

### c. Failure to properly investigate.

¶56 Dawson contends that the District Court erred when it found that his counsel did not conduct an ineffective pretrial investigation.

¶57 First, Dawson asserts that his counsel should have obtained the complete records of his evaluation at Montana State Hospital, including the staff notes. Dawson argues that the District Court relied on his lack of remorse as a factor in imposing the death penalty and, therefore, he was prejudiced by his counsel's failure to obtain staff notes which reflected his emotional state during his 48-day evaluation at Montana State Hospital.

¶58 In response, the State contends that counsel's failure to obtain the staff notes did not prejudice Dawson because they indicate that Dawson showed some display of emotion only four times during the 48 days he was at Montana State Hospital. Moreover, the staff notes indicate that Dawson ate and slept well and that on one particular day he appeared to be in a good mood and was seen laughing with a visitor. Additionally, the State asserts that the District Court's finding at the sentencing phase regarding Dawson's apparent lack of remorse was based on the court's own evaluation of Dawson throughout the extensive court proceedings, and not a result, as Dawson contends, of Dr. Van Hassel's testimony.

¶59 At trial, Dr. Van Hassel testified on direct examination by the State to the following:

> A. [By Dr. Van Hassel] The only thing that appeared out of the ordinary whatsoever was his apparent lack of observable distress about his situation. Given the fact that he had been accused of some very serious crimes and was facing some very serious consequences. He did not appear to show any anxiety about that. He did not show any outward signs of depression about that. Nor did he show outward signs of anger about that.

Dawson argues that had his counsel obtained the staff notes reflecting his emotional displays, his counsel could have contradicted Dr. Van Hassel's testimony that Dawson showed no emotional response, and as a result the District Court would not have found that he lacked remorse.

¶60 The District Court concluded that Dawson could show no prejudice as a result of his counsel's failure to obtain the notes and records, stating:

> Although it may have been helpful to have those records they would have had no effect on the issues of guilt. Judge Barz in her findings relied on her observations during the trial and other appropriate evidence in reaching her conclusions concerning the death sentence.

¶61 The sentencing court's findings of fact regarding Dawson's lack of remorse were as follows:

> The Court has had the opportunity to observe the Defendant during the entire trial and throughout all proceedings. His conduct in all proceedings has been appropriate. Scarcely a word had been spoken in the Court's presence. The complete lack of emotion and cool detachment in his demeanor has been noted throughout. As Dr. Van Hassel testified, lack of an emotional response can be a coping mechanism of denial, or a personality that shows no overt emotion normally or, finally, that the person truly is not concerned. Whatever the reason, the Defendant has demonstrated no remorse or genuine concern or respect for human life to the time of sentencing.

It is clear from the District Court's findings that it relied on its own observations of Dawson throughout the proceedings to conclude that he displayed an apparent lack of remorse.

¶62 Moreover, at the evidentiary hearing to consider Dawson's ineffective assistance claims, Dr. Van Hassel testified, regarding the staff notes, that: "it was the consensus of the professionals involved in the evaluation that overall his displays of emotion were substantially less than what you might have expected for someone in his situation."

¶63 Accordingly, we conclude that the District Court did not err when it found that Dawson could not establish prejudice as a result of his counsel's failure to obtain the complete records and staff notes of his evaluation at Montana State Hospital.

¶64 Second, Dawson contends that his counsel should have pursued the possibility that he suffered from epilepsy. Dawson asserts that his mental health evaluation recommended further EEG testing because of the possibility of epilepsy and, therefore, his counsel should have explored this possibility.

¶65 In response, the State asserts that Dawson's counsel's decision not to further pursue an investigation that Dawson may have suffered from epilepsy was reasonable considering that Dawson had no history of serious head injuries, gave his attorneys no reason to believe he might be suffering from epilepsy or neurological problems of any kind, and the CT scan and second EEG performed on Dawson were normal.

¶66 At the evidentiary hearing to consider Dawson's petition for postconviction relief, Allen Beck, Dawson's trial counsel, testified that nothing in the defense's pretrial preparation, including medical information and information from Dawson himself, indicated that he suffered from epilepsy. Beck testified further, that he did not believe there was any basis to pursue the possibility that Dawson suffered from epilepsy as a defense at trial.

¶67 Dr. Gary Cooney, a neurologist who interpreted the two EEG tests performed on Dawson, also testified at the evidentiary hearing. Dr. Cooney testified that the abnormalities found in the initial EEG were not strongly suggestive of epilepsy, and that there were alternative explanations for the intermittent spike discharges, which did not necessarily indicate an abnormality. Dr. Cooney testified that following the initial EEG, a CT scan and a second EEG were ordered. The results of the CT scan and the second EEG were normal.

¶68 Accordingly, we conclude that the District Court did not err when it found that there was no evidence presented that Dawson was epileptic and, therefore, Dawson's counsel's decision not to further pursue this factor was reasonable.

¶69 Third, Dawson asserts that his counsel failed to investigate the consequences of Dawson's drug ingestion. Dawson contends that the affidavit testimony of Dr. Watkins submitted at the evidentiary hearing to consider Dawson's petition for postconviction relief established that Dawson's mental capacity was impaired by his drug use.

¶70 In response, the State asserts that Dawson's counsel did pursue an investigation into the consequences of Dawson's drug use, and thereafter determined that it would not be an adequate defense under the circumstances of this case. The State contends that Dawson's counsel made a reasonable decision not to present evidence of Dawson's drug use and its consequences at trial and sentencing, after consulting with Dr. Watkins. The State points out that after receiving information regarding Dawson's reported drug use during the incident, and then conducting an extensive interview with Dawson, Dr. Watkins concluded

that Dawson was merely in a "mild dissociated state" at the time of the incident as a result of his use of methamphetamines. Additionally, the State contends that the affidavit testimony of Dr. William Stratford, submitted by the State at the evidentiary hearing, sufficiently rebuts Dawson's claim that his mental capacity was diminished at the time of the offense as a result of his drug use.

¶71 The District Court concluded that:

> It is certainly doubtful that any of this kind of evidence would have had any effect on the determination of guilt made in the jury verdict. Defendant's attorneys thought that evidence of claimed drug or alcohol use on the part of Dawson would be an aggravating factor in sentencing before the sentencing judge.

¶72 At the hearing to consider Dawson's petition for postconviction relief, Allen Beck testified as follows:

> Q. Did you make a decision not to call Dr. Watkins at trial?
>
> A. Yes, I did.
>
> Q. And what was the basis for your decision not to call Dr. Watkins at trial?
>
> A. His diagnosis.
>
> Q. And what was that?
>
> A. That he had a mild disassociated state which was, in Dr. Watkins' opinion, related to the use of methamphetamines.
>
> Q. And did you reach a decision that that would not be an adequate defense in the case?
>
> A. Yes, I did. I think the combination-if I were to have used Dr. Watkins, it would have then been incumbent upon us, Your Honor, to turn over the tape-recorded-or the video interview. That's in my view a statement under Montana law, and there were enough inculpatory admissions that I think the combined effect of the weak nature of Dr. Watkins' testimony and the video far outweighed-the prejudice far outweighed the benefit from trying than the benefit from trying to use them in trial.

¶73 The affidavit of Dr. Watkins, submitted by the defense, stated the following:

> The testing and interviewing done at Warm Springs supports my opinion that, if Mr. Dawson committed the murders, he was in a drug induced dissociative state and his normal personality was not in control.
>
> . . . .
>
> . . . In the days before the crime, Mr. Dawson was injecting substantial amounts of methamphetamine and drinking alcohol. He had apparently had little sleep for days. The stress factors combined with the drugs and alcohol created conditions conducive to dissociation.

¶74 The rebuttal affidavit of Dr. Stratford, submitted by the State, stated the following:

> Dr. Watkins, in his affidavit, concluded that Mr. Dawson is neither psychotic nor a sociopath, and that he does not suffer from a multiple personality disorder. He did diagnose an atypical dissociative disorder. He also noted that amphetamines are a drug which can cause dissociative states.
>
> In my opinion, after watching the videotape [of Dr. Watkins' interview with Dawson], the evidence for a dissociative disorder is extremely slim. In my opinion, after watching the videotape, Dawson was led to the dissociative description by Dr. Watkins and thus the evidence for this diagnosis is so very slight as to be almost insignificant.
>
> . . . .
>
> Dr. Watkins states in his affidavit that Dawson's behavior was irrational and confused at the time of the crimes. In fact, one of the striking elements is the deliberate, focused, conduct of Dawson during the 44-hour period between the time of the abductions to the time of Dawson's arrest. During that period of time, Dawson consistently demonstrated conduct which evidenced knowledge, purpose, and planning. Examples of this conduct are that Dawson brought tape and a gun to the motel; he wiped a towel through Room 149, taking fingerprints off of anything he might have touched; he moved the Rodsteins' cars, taking a different route to the

Husky Station each time he moved the cars, etc. In fact, at page 130 of the transcript of the interview, Dawson admits to Watkins that the crimes were "definitely planned."

. . . .

. . . In my opinion, the evidence in this case for atypical dissociative disorder is so slight as to be almost insignificant. Even if it was present, atypical dissociative disorder is not a mental disease or defect, but a neurosis which would not affect Dawson's capacity to act with knowledge or purpose.

¶75 In *Strickland*, the Supreme Court stated the following with regard to a counsel's duty to investigate:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland, 466 U.S at 690-91, 104 S. Ct. at 2066.*

¶76 Our review of the record reveals that Dawson's counsel's decision to not further investigate or pursue Dawson's drug use was a reasonable one under the circumstances. Dawson's counsel realized that at trial Dr. Watkins' testimony that Dawson suffered from a mild dissociative state as a result of methamphetamine use would not have any real effect on the verdict arrived at by the jury, because it was not evidence of a mental disease or defect, it did not affect his ability to act with knowledge or purpose and there was evidence that Dawson acted with the required mental state. Additionally, Dawson's counsel was aware that in order to call Dr. Watkins as an expert witness, they would be required to provide the State with a potentially damaging four-hour interview of Dawson by Dr. Watkins in which Dawson made several inculpatory statements.

¶77 With regard to Dr. Watkins' possible testimony at sentencing to establish Dawson's drug use as a mitigating factor, we conclude that it was reasonable for Dawson's counsel to conclude that the potential harm from that testimony outweighed the possible benefit.

¶78 Our review of the trial transcript reveals a considerable amount of testimony which established Dawson's planning and purposeful behavior before and during the crimes: he checked in using a false name and address; parked his car behind the motel, away from his room; he had material to gag and bind the Rodsteins already laid out on his bed when he brought them into his room; he wiped everything he might have touched in the Rodsteins' room with a towel to eliminate his fingerprints; he hung the "Do Not Disturb" sign on his door; he called the motel maid service and requested that they not clean his room; he moved the Rodsteins' cars from the motel parking lot to a nearby gas station, using a different route each time; when he noticed the police looking at the Rodsteins' cars, knowing that his fingerprints were on the cars, he came out of his motel room and told the officers that someone had been fooling around with the cars and he had tried to fix them; he also told the officers that his real name was not the name he was registered under, knowing that his motel registration and car registration were under different names.

¶79 Dawson's counsel reasonably believed that arguing to the sentencing judge that Dawson's drug use affected his mental capacity, in the face of the overwhelming evidence that Dawson's capacity was not impaired, would not be beneficial to Dawson.

¶80 Therefore, we conclude that Dawson's counsel's decision not to further pursue or investigate Dawson's drug use, was a reasonable decision under the circumstances. Dawson's counsel made a reasonable investigation into the consequences of Dawson's drug use and as a result of that investigation, made a reasonable strategic decision to not focus on Dawson's drug use at trial, or as a mitigating factor at sentencing. We conclude that the District Court did not err when it found that Dawson's counsel did not render ineffective assistance because they failed to further investigate the consequences of Dawson's drug use.

¶81 Accordingly, we conclude that the District Court did not err when it found and concluded that Dawson did not receive ineffective assistance at the pretrial phase.

ISSUE 2

¶82 Did the District Court err when it found that Dawson did not receive ineffective

assistance of counsel during the trial phase?

¶83 Dawson asserts that his trial counsel, Allen Beck and Gary Wilcox, rendered ineffective assistance during the trial phase. First, Dawson contends that his counsel were ineffective because they agreed to the procedure used to present Amy Rodstein's testimony. Second, Dawson asserts that his counsel were ineffective because they failed to corroborate the defense theory by examination of Amy. Third, Dawson contends that his counsel were ineffective because they failed to give an opening statement. Fourth, Dawson asserts that his counsel were ineffective because they failed to object to guilt phase errors, including improper questions and comments by the State. Fifth, Dawson contends that his counsel were ineffective because they failed to obtain experts to testify at trial. Sixth, Dawson asserts that his counsel were ineffective because they failed to give a closing argument.

### a. The procedure used to present Amy Rodstein's testimony.

¶84 Dawson argues that his trial counsel rendered ineffective assistance when they agreed to have Amy Rodstein's guardian ad litem, Damon Gannett, question Amy at trial. Both sides reserved the right to submit additional questions to Amy through her guardian ad litem following her initial testimony. Dawson asserts that this procedure conceded Amy's credibility and the impact of her testimony. Dawson also contends that the procedure permitted leading questions concerning Dawson's involvement, and deprived Dawson of his opportunity to challenge or confront Amy's testimony in any meaningful way.

¶85 In response, the State contends that the procedure was the result of sound strategy adopted by Dawson's defense counsel and was not unreasonable under the circumstances. Moreover, Dawson agreed to the procedure.

¶86 The District Court found as follows:

> The procedure was a part of the strategy adopted by trial counsel and was not unreasonable under the circumstances. Ms. Rodstein was 16 years old at the time of trial and 15 years old at the time of the incident. She was the sole survivor. Much of her testimony was favorable to the defense. She did not hear or observe any strangling of her other family members while with Dawson. She was understandably a fragile witness. Beck apparently felt it was important to have her testimony. An agreement to handle her testimony as it was handled was something within his

permissible strategy at time of trial.

¶87 At the evidentiary hearing to consider Dawson's petition for postconviction relief, Allen Beck explained why the defense agreed to the procedure for Amy's trial testimony:

> I had formed the opinion early on in the case from having Amy Rodstein's statements evaluated by a child psychologist that she was very definitely traumatized by the incident and may not be able to withstand the rigors of going through a normal examination-cross-examination in our adversarial system.
>
> . . . .
>
> It was clear to me through the course of interviewing her in Damon's office-Damon did the entire interview-that she would be able to perhaps get through a direct examination, but I doubted seriously that she would be able to get through a cross-examination, which would thus effectively not enable us to cross-examine her. Therefore, I suggested the procedure whereby Damon Gannett be the person who questioned her.

¶88 Defense counsel's decision to use a special procedure to present the testimony of Amy Rodstein was a reasonable strategy under the circumstances. Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel's decision to allow Amy's guardian ad litem to question her at trial did not constitute ineffective assistance of counsel.

b. Failure to present the defense theory through Amy Rodstein's testimony.

¶89 Dawson argues that his counsel rendered ineffective assistance because they did not ask about Amy's statement to the police that she saw a man who acted as a look out, and that Dawson signaled to this man. Dawson asserts that this was a failure to present critical evidence by which he was prejudiced.

¶90 In response, the State contends that Dawson overstates the nature and significance of Amy's observations. The State points out that in her police statement, Amy merely stated that she saw a man standing in the parking lot, looking at the main office, that she did not think that she could identify him because it was too dark, he was too far away, and he did not look directly at them; that, later on, Dawson said that "there was a guy outside that was his watch-out for him"; and that Amy said she did not know for sure if Dawson was

referring to the man she saw in the parking lot as being the watch-out.

¶91 At the evidentiary hearing to consider Dawson's petition for postconviction relief, defense counsel Allen Beck testified to the following as his reason for not questioning Amy regarding the alleged watch-out:

> Q. Do you recall whether you had a reason for not asking Damon Gannett to question her regarding those-regarding that observation?
>
> A. Well . . . it was my observation of Amy Rodstein at that time that she had reached her limit. I didn't think that she was capable of proceeding, and I just simply wanted her off the stand, rather than prolonging anything further.

¶92 The District Court found that:

> A failure to cross examine her about other particular issues when her testimony ended abruptly at the emotional moment referred to in the findings was also appropriate. She had already testified to certain conduct and observations of Dawson related to other individuals in telephone calls and travelling [sic] to homes supportive of the defense theory.

¶93 The record reveals that at the conclusion of Amy's testimony, she was asked what she was thinking prior to a police detective opening the door, and she answered: "I was thinking: Why is this happening to me and my family: Am I going to live to see tomorrow? Is my Mom and Dad and my Brother going to be with me?" At that point, Mr. Gannett asked for a break, which the court granted. Both the State and Dawson's counsel then proceeded to chambers where they made a record which reflected the various emotional responses to the end of Amy's testimony. Apparently, Amy, several members of the jury, and other persons in the court room were either crying, or having some emotional reaction to her testimony. It was at this point that Dawson's counsel decided not to subject Amy to further examination.

¶94 We conclude that under the circumstances, Dawson's counsel's decision to not subject Amy to further questioning, was reasonable. Amy had previously testified regarding certain conduct and observations of Dawson related to other individuals which supported the defense theory that Dawson acted under the duress or control of another. While Amy's

further testimony may or may not have added to that theory, it was reasonable for Dawson's counsel to believe that having Amy on the stand, in the emotional state she was in, and further working the jurors' emotions, would have been more damaging to the defense than helpful. Therefore, we conclude that the District Court did not err when it found that Dawson's counsel were not ineffective when they chose not to examine Amy further.

### c. Failure to make an opening statement.

¶95 Dawson contends that his counsel were ineffective because they failed to give an opening statement at trial. Dawson asserts that his counsel could have given an opening statement, without Dawson's assistance in his defense, based on the defense theory that Dawson acted under duress.

¶96 The State responds that the defense properly reserved its opening statement, and hoped that after watching the State present its case-in-chief, that Dawson would see the wisdom of assisting in his defense and provide his counsel with full information regarding what happened, which would have allowed Dawson's counsel to give an effective opening statement.

¶97 The District Court found that:

> The failure to make an opening statement was within appropriate trial strategy on the part of Beck. Beck thought connective evidence would be provided by Dawson. That evidence was never provided to allow a statement of what Beck intended to prove as a substantive defense. There was little Beck could say in the way of opening statement. Beck had little evidence available to rebut the State's evidence. Such failure is not prejudicial to Dawson because of the overwhelming evidence of his guilt.

¶98 At the evidentiary hearing to consider Dawson's petition for postconviction relief, Allen Beck testified to the following:

> A. When I asked David [Dawson] repeatedly prior to trial to describe to me in more detail what happened, he refused to do so, and he would either directly or obliquely refer to the fear of his own safety, that of his daughter's and that of his family.

In that context we then went into a trial, and I have had numerous experiences where people in Mr. Dawson's position, having seen the State's case as it goes in, would often be affected by that and be willing to assist in their defense more clearly and even be willing to testify. Therefore, we weren't in a position to give an opening statement because I was still in the hopes that David Dawson would see the wisdom in assisting in his defense by providing us the full information of what happened.

. . . .

Q. [By the court] And would that be true then for a reserved opening statement, as well as an opening statement at the beginning of trial before prosecution evidence?

A. Yes, Your Honor.

¶99 The decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not form the basis for a claim of ineffective assistance of counsel. *See United States v. Rodrigues-Ramirez* (9th Cir. 1985), 777 F. 2d 454, 458. In *United States v. Nersesian* (2d Cir. 1987), 824 F.2d 1294, 1321, the court stated:

Counsel's choice of strategy was certainly reasonable under the circumstances. By waiving opening argument the defense did not commit itself to a particular position and was thus free to develop any defense that might materialize as the prosecution presented its case.

¶100 Therefore, we conclude that Dawson's counsel's decision to waive an opening statement was reasonable trial strategy under the circumstances. Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel did not render ineffective assistance because they failed to give an opening statement.

d. Failure to object at trial.

¶101 Dawson contends that his counsel rendered ineffective assistance because, at trial, they did not object to improper direct examination questions by the State, improper comments during the State's closing argument, and improper testimony by Dr. Van Hassel regarding Dawson's mental state. First, Dawson asserts that his counsel failed to object

when during the State's examination of a detective, the questions amounted to prosecutorial comment on Dawson's post-arrest silence.

¶102 As the State correctly points out, Dawson's counsel did in fact object when the detective was directly asked about post-arrest silence, and that objection was sustained by the District Court. Further, we addressed this issue in Dawson's direct appeal, stating: "[s]ince no answer was given, we conclude that this question about the defendant's silence was harmless." *Dawson,* 233 Mont. at 357, 761 P.2d at 359. Accordingly, Dawson's assertion is without merit. Other questions and answers to which Dawson now refers were related to actual statements made by Dawson following his arrest. We conclude that it was not ineffective when counsel did not object to that line of questioning.

¶103 Second, Dawson contends that his counsel were ineffective because they failed to object to the State's use of the phrase "killing pen" four times during its closing argument. Dawson asserts that his counsel's failure to object precluded him from raising this issue on direct appeal.

¶104 In response, the State contends that Dawson's counsel's decision not to object was a reasonable one considering that the facts clearly supported the State's description of the area. The State asserts that there was ample evidence that Dawson killed the Rodsteins and then stored their three bodies in the small sink area outside the bathroom. The State further contends that it would not have been a wise defense tactic to object and thereby allow the State to defend the term "killing pen" and focus the jury's attention on the term.

¶105 "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necochea* (9th Cir. 1993), 986 F.2d 1273, 1281 (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

¶106 Because we conclude that the term "killing pen" was not an egregious misstatement, we further conclude that Dawson's counsel's decision not to object to the use of the phrase during closing argument was reasonable. Therefore, we conclude that the District Court did not err when it found that Dawson's counsel did not render ineffective assistance when they failed to object during closing argument.

¶107 Finally, Dawson argues that his counsel were ineffective because they did not object

to Dr. Van Hassel's testimony that Dawson was capable of acting with purpose and knowledge, the required mental state. Dawson contends that his counsel should have objected on the basis that the testimony was a product of a psychiatric evaluation conducted in violation of Dawson's constitutional rights.

¶108 As we previously discussed, an objection to Dr. Van Hassel's testimony on the basis that the testimony was a product of a psychiatric evaluation conducted in violation of Dawson's constitutional rights, would not have been successful because the evaluation complied with the Montana statutory scheme at the time of the evaluation and at trial. Accordingly, we conclude that Dawson's counsel were not ineffective because they did not object to the testimony.

e. Failure to obtain experts.

¶109 Dawson argues that his counsel were ineffective because they did not offer expert testimony on the issues of Dawson's drug ingestion and Dawson's head injuries and EEG tests.

¶110 As previously discussed, Dawson's counsel's decision not to call Dr. Watkins on the issue of Dawson's drug ingestion did not amount to ineffective assistance of counsel. Likewise, Dawson's counsel's decision to not further explore or present expert testimony on the issue of Dawson's two minor head injuries and Dawson's EEG tests, as discussed previously, did not amount to ineffective assistance of counsel. Accordingly, we conclude that the District Court did not err when it found that Dawson's counsel's decision to not present expert testimony on these issues did not amount to ineffective assistance of counsel.

f. Failure to give a closing argument.

¶111 Dawson contends that his counsel were ineffective because they did not give a closing argument at trial.

¶112 At the evidentiary hearing to consider Dawson's petition for postconviction relief, Allen Beck testified as follows:

Q. Why was no closing argument presented by the defense at the trial?

. . . .

A. Those are the opinions that I recall. The opening argument by Mr. Paxinos was basically an outline of the evidence. It wasn't inflammatory. There really wasn't much to rebut. Secondly, as I indicated before, I noticed Harold Hanser's position, attitude. Having tried cases with him before, I was pretty sure that he was going to come in and tie everything together in a relatively emotive fashion. And part of that related to sexual paraphernalia.

David, through the course of our investigation, seemed to me to be sensitive about the sexual paraphernalia and the intimations that the State was obviously going to make about it. So during the course of Mr. Paxinos' closing, I passed a note to-by David, who was sitting next to me-to Gary and said that I'd never failed to make a closing argument before, but perhaps this was a case we should consider it. The notes went back and forth.

At the close of the opening part of the State's argument and before my argument, I asked for a recess. It was granted. We went into a caucus. The defense team and David Dawson discussed the pros and cons of making a closing argument. David was in favor of not making a closing argument and we did not.

. . . .

Q. Did you have a strong closing argument to give at the time that you made this decision?

A. At that stage of the trial, no. There were a few fragmentary facts that we would collect . . . but basically it would have been an argument which would have discussed what was in the instructions. There's the presumption of innocence, burden of proof and beyond a reasonable doubt.

¶113 The District Court concluded that:

The strategy reasons outlined by Beck for not making a closing argument were reasonable trial strategy. Such strategy was successful in that the more experienced county attorney was precluded from making an argument which would tie all elements together and possibly include references to sexual paraphernalia that were not made in the opening argument by the less experienced deputy county attorney.

¶114 "Though closing argument is often an invaluable tool as it serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case, an attorney's decision to waive closing argument does not *per se* constitute ineffective assistance." *State v. Lee* (Ariz. 1984), 689 P.2d 153, 160 (internal citation omitted). We agree with the Supreme Court of Arizona's reasoning as set forth in *Lee*:

> We will not inquire into the advisability of waiver of closing argument as a ground for ineffective assistance where waiver was a reasoned election of a trial strategy. However, where trial counsel's decision to waive closing argument is unreasonable in that it is below the threshold of what minimally competent defense counsel would do under a given set of circumstances, counsel's conduct will not escape judicial scrutiny.

*State v. Lee, 689 P.2d at 161.*

¶115 We conclude that under the circumstances, Dawson's counsel's decision to not give a closing argument was a reasonable trial strategy and did not fall below the standard of what a minimally competent defense attorney would have done in the same circumstances. Therefore, we conclude that the District Court did not err when it concluded that Dawson's counsel were not ineffective when they decided not to give a closing argument.

¶116 Accordingly, we conclude that the District Court did not err when it found that Dawson did not receive ineffective assistance of counsel at the trial phase.

## ISSUE 3

¶117 Did the District Court err when it found that Dawson did not receive ineffective assistance of counsel during the sentencing phase?

¶118 Dawson asserts that the District Court erred when it found that his counsel did not render ineffective assistance at the sentencing phase. First, Dawson contends that his counsel were ineffective because they failed to present crucial mitigating evidence to the sentencing court. Second, Dawson asserts that his counsel were ineffective because they failed to conduct an adequate investigation at the sentencing phase. Finally, Dawson contends that his counsel were ineffective because they failed to move the sentencing court for reconsideration of its conclusion that Dawson posed a substantial and continuing threat and had no chance for rehabilitation.

¶119 "The right to effective assistance of counsel applies with equal force at the penalty phase of a bifurcated capital trial. . . . In this context, prejudice means a reasonable probability that but for counsel's errors, a different sentence would have been imposed." *Clabourne v. Lewis* (9th Cir. 1995), 64 F.3d 1373, 1378.

a. Failure to offer mitigating evidence to the sentencing court.

¶120 Dawson argues that his counsel rendered ineffective assistance because they failed to offer crucial mitigating evidence to the sentencing court.

¶121 First, Dawson asserts that his counsel failed to offer Amy's statement to the police regarding the man she saw in the parking lot. Dawson contends that his counsel should have offered Amy's statements because it would have bolstered the defense theory that Dawson acted under the duress or coercion of another.

¶122 As previously discussed, Amy's statement to the police was vague. Further, defense counsel had no information that the man in the parking lot was connected in any way with this incident. Additionally, prior to the sentencing hearing, Dawson's counsel specifically asked Dawson to provide them with information regarding the involvement of others and Dawson replied that he had nothing to tell them. Moreover, apparently, neither the jury, nor the sentencing court accepted the defense theory that Dawson was acting under the control of another. Therefore, Dawson has not shown that the failure to offer this evidence prejudiced him.

¶123 Second, Dawson contends that his counsel failed to present evidence regarding Dawson's use of drugs at the time of the incident. Dawson asserts that evidence of his drug use was already before the court and thus a decision by his counsel not to discuss the issue at sentencing could not reasonably have been based on a wish to keep information away from the judge.

¶124 In response, the State agrees that evidence of Dawson's drug use was before the court and asserts that the sentencing judge did consider the evidence of Dawson's drug use as a possible mitigator, but ultimately determined that it was not. The State points to the sentencing court's finding in which Judge Barz stated:

> The defendant reported to the pre-sentence investigator that at the time of the current offenses he used crystal methamphetamine. He couldn't remember the exact

amount, but that it was more than just a little bit, but not an abnormal amount. *There is absolutely no evidence showing that the Defendant's mental capacity was impaired.*

(Emphasis added.)

¶125 At the evidentiary hearing to consider Dawson's petition for postconviction relief, Allen Beck testified to his reasoning for not arguing drug use as a mitigating factor:

> Q. Did you consider calling Dr. Watkins as a witness at the mitigation hearing?
>
> A. Yes.
>
> Q. And did you make a decision not to do that?
>
> A. I did.
>
> Q. And what was your reason for that decision?
>
> A. To put it simply, in looking at any judge, and I think particularly Judge Barz, Your Honor, to say that I engaged in this conduct because I took drugs is not a matter in mitigation. It's a matter in aggravation. It's that these deaths occurred because I was high on drugs seems to me and under the facts in this case to be highly inflammatory and prejudicial.

Beck felt that, based on the facts in this case, including a record replete with actions by Dawson which evidenced that his mental capacity was not impaired at the time of the incident, to argue outright that Dawson engaged in this conduct because he used drugs was inflammatory and would not benefit Dawson. Beck's decision was a reasonable defense strategy under the circumstances.

¶126 Therefore, we conclude that Dawson's counsel's decision not to present or argue evidence of Dawson's drug use as a mitigating factor did not constitute ineffective assistance of counsel.

¶127 Finally, Dawson asserts that his counsel failed to present evidence of Dawson's good conduct in jail while awaiting trial. Dawson contends that his counsel failed to recognize this as a mitigating factor and that this evidence would have contradicted the sentencing

court's conclusion that Dawson posed a risk to society and could not be rehabilitated.

¶128 In response, the State asserts that evidence of Dawson's good behavior in jail was presented at the guilt phase and, therefore, considered at the sentencing phase. The State also points out the following testimony of Denise Hust, a correctional officer in the Yellowstone County Detention Facility, elicited at trial by Dawson's counsel on cross-examination:

Q. [By Gary Wilcox] Now, you have had an opportunity to observe him quite a bit in the months that he was in the jail; is that right?

A. Yes.

Q. It is safe to testify that he has been, in the words in your statement, a model prisoner; is that right?

A. Yes.

Q. You have had no problems with as far as violent outbursts; is that correct?

A. No.

Q. And he has not gotten into any violent disputes with any other individuals in the jail facility; is that correct?

A. Correct.

. . . .

Q. And he is one of the better behaved prisoners that you have up there; is that also not correct?

A. That is correct.

¶129 Section 46-18-302, MCA (1985), provides that in the sentencing hearing in a case where the death penalty may be imposed, "[e]vidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding."

¶130 Accordingly, we conclude that Dawson's argument that his counsel rendered ineffective assistance because they failed to present evidence of his good behavior in jail, is without merit.

   b. Failure to conduct an adequate investigation.

¶131 Dawson argues that he received ineffective assistance because his counsel failed to conduct an adequate investigation during the sentencing phase. First, Dawson contends that his counsel overlooked demonstrations of remorse found in the Montana State Hospital staff's notes. Dawson asserts that this information would have served to rebut the finding by the sentencing court that Dawson felt no remorse.

¶132 As previously discussed, the sentencing court's finding regarding Dawson's lack of remorse was based on the court's own observations throughout the lengthy proceedings against Dawson. Therefore, we conclude that substantial evidence supports the District Court's finding that Dawson was not prejudiced by his counsel's failure to discover the Montana State Hospital staff notes regarding Dawson's behavior.

¶133 Second, Dawson asserts that his counsel failed to investigate Dawson's medical and school records. Dawson contends that the medical records would have established that he suffered a number of injuries, including head injuries. Dawson further asserts that these injuries were discussed in the Montana State Hospital evaluation report, and thus his counsel had notice of where the injuries and the hospitalizations occurred. With regard to his school records, Dawson contends that they would have established that he was seen by a psychiatrist while he was in school in California. Dawson asserts that his medical and school records would have reflected mitigating circumstances.

¶134 The State responds that, with regard to Dawson's medical records, he has failed to indicate how any additional information would be a mitigating factor in this case. Both the presentence report and the Montana State Hospital evaluation report contained information regarding Dawson's previous medical history. The presentence report contained information regarding an apartment fire in which Dawson was burned, and a knee injury and subsequent surgery on his knee. The Montana State Hospital report contained information regarding two minor head injuries, neither of which resulted in unconsciousness, and Dawson reported no lasting effects and no history of any seizures. Additionally, as previously discussed, Dawson's CT scan and second EEG were normal.

¶135 With regard to Dawson's school records, the State asserts that the Montana State Hospital report states that Dawson had seen a psychiatrist twice while in school. Dawson reported that the reason was frequent absence from classes. Dawson additionally denied any history of psychiatric hospitalizations or services.

¶136 In *Strickland,* the Supreme Court stated that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066.

¶137 We conclude that it was reasonable for Dawson's counsel not to pursue further investigation into Dawson's medical and school records. Dawson did not give his counsel any reason to believe that such an investigation would be beneficial. Nor is there any evidence that such an investigation would be beneficial. Accordingly, we conclude that Dawson did not receive ineffective assistance because his counsel failed to investigate his medical or school records.

¶138 Finally, Dawson asserts that his counsel should have investigated and interviewed his family and boyhood friends, to develop, or at a minimum, determine the existence of mitigating evidence.

¶139 In response, the State contends that Dawson has failed to allege the names of family and boyhood friends whom he thinks his counsel should have interviewed, what information would have been provided, and the significance of that information to this case.

¶140 The District Court found that:

> No showing is made concerning what would have been learned in such interviews. It is unreasonable to expect counsel to interview everyone involved in the life of a convicted defendant even when the conviction is of deliberate homicide in a potential death case. No prejudice has been shown. The presentence investigation showed no previous criminal record on the part of Dawson.

¶141 Our review of the record reveals that Dawson's counsel did contact and interview Dawson's mother and sister, and presented letters from each of them to the court at sentencing. Additionally, the presentence report included letters from Dawson's former

spouses. Accordingly, we conclude that Dawson's counsel did not render ineffective assistance by failing to further investigate Dawson's family and boyhood friends.

### c. Failure to move for a reconsideration.

¶142 Dawson argues that he received ineffective assistance because his counsel failed to move the sentencing court for a reconsideration of its conclusion that Dawson posed a substantial and continuing threat and that his chances for rehabilitation were nonexistent. Dawson contends that the sentencing court's conclusions were based on erroneous information and lack any factual basis.

¶143 In *State v. Dawson*, 233 Mont. at 363, 761 P.2d at 363, this Court upheld Dawson's death sentence pursuant to § 46-18-310, MCA, which provides for automatic review of a death sentence. In that case, we determined that the evidence supported the sentencing court's finding of those aggravating factors, and concluded that the court's sentence of death was appropriate under the circumstances. *Dawson,* 233 Mont. at 363, 761 P.2d at 363.

¶144 Therefore, Dawson can show no prejudice from his counsel's failure to move for reconsideration of the sentencing court's conclusions. Accordingly, we conclude that the District Court did not err when it found that Dawson did not receive ineffective assistance as a result of his counsel's failure to move for a rehearing.

¶145 Accordingly, we conclude that the District Court did not err when it found that Dawson did not receive ineffective assistance of counsel at the sentencing phase.

## ISSUE 4

¶146 Did the District Court err when it found that Dawson did not receive ineffective assistance of counsel during the direct appeal phase?

¶147 We review claims of ineffective assistance of appellate counsel according to the standard set forth in *Strickland. See Hagen v. State*, 1999 MT 8, ¶ 10, 293 Mont. 60, ¶ 10, 973 P.2d 233, ¶10. The petitioner must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal. *See Miller v. Keeney* (9th Cir. 1989), 882 F.2d 1428, 1434.

¶148 Dawson argues that his appellate counsel, Jeff Renz, rendered ineffective assistance of counsel because he failed to raise all possible issues on direct appeal. Dawson contends that, because he was facing a sentence of death, Renz had a duty to raise every possible issue, not just those that Renz deemed to have merit. Dawson asserts that Renz had no tactical or strategic reason for failing to raise many of the issues and that those claims not raised by Renz on direct appeal were subsequently dismissed by partial summary judgment during postconviction proceedings.

¶149 The State responds that appellate counsel does not have a duty to raise every possible issue. The State asserts that, historically, effective advocates have winnowed out weaker arguments and have focused on a few central issues. The State points out that Renz reviewed the entire record, discussed the case with trial counsel and Dawson, did legal research, and then narrowed the issues to those he felt were most important and meritorious.

¶150 The District Court found that:

> Any appellate counsel worth his salt realizes that to make an effective argument one must argue his strongest points and not get bogged down into minutia as current counsel would apparently contend Renz should have done on the appeal of this case. Renz was highly qualified to handle the appeal. Renz did a thorough preparation for the appeal process by his review of the record, interviews with trial counsel, discussions with qualified attorneys in the field and the solicitation of reviews of his briefs prior to filing. Many of the current claims of ineffective assistance of appellate counsel can only be classified as second guessing.

¶151 First, Dawson contends that his appellate counsel should have raised several claims based upon the *Ake* decision and its subsequent extension in *Smith v. McCormick*. However, as previously discussed, there was no case law at the time of Dawson's psychiatric evaluation, at the time of Dawson's trial, or at the time of the direct appeal in 1988, which would have led Dawson's appellate counsel to believe that the psychiatric evaluation issues were mishandled in any way by the trial court. The extension of *Ake* by *Smith v. McCormick* was not decided until September 1990, and at the time of the direct appeal *State v. Smith*, which upheld Montana's psychiatric evaluation process in light of *Ake*, was controlling authority.

¶152 Second, Dawson asserts that the limitations in the psychiatric examination, including

the fact that the evaluation precluded the mental health professionals from considering evidence of a mitigating character, denied him his constitutional rights and, therefore, his appellate counsel should have raised this issue on appeal. However, as previously discussed, Dawson was appointed his own psychiatric expert, Dr. Watkins, who did consider evidence of mitigating factors. For this reason, Dawson is unable to show any prejudice as a result of his appellate counsel's failure to raise this issue on appeal.

¶153 Third, Dawson contends that his appellate counsel should have raised the issue that the sentencing court failed to consider all mitigating evidence. However, Dawson has not shown what mitigating evidence the sentencing court failed to consider. Our review of the record reveals that the sentencing court, as set forth in its sentencing order, considered all of the mitigating evidence offered, and then weighed the mitigating factors against the aggravating factors. Moreover, we addressed a similar issue in our independent review of Dawson's death sentence on direct appeal pursuant to § 46-18-310, MCA, and determined that the evidence supported the sentencing court's findings on mitigating and aggravating circumstances. *See State v. Dawson*, 233 Mont. at 362, 761 P.2d at 362. Therefore, Dawson's appellate counsel's decision not to raise this issue on direct appeal was reasonable and Dawson can show no prejudice as a result of counsel's failure to raise this issue.

¶154 Fourth, Dawson asserts that his appellate counsel should have raised the issue on direct appeal that Dawson's due process rights were infringed upon by the trial court's emotional response to Amy Rodstein's testimony. Dawson's appellate counsel did raise this issue on direct appeal as a violation of Dawson's Sixth Amendment right to an impartial jury. On direct appeal we concluded that "the transcript does not convey any potential prejudice by the court." *State v. Dawson*, 233 Mont. at 355, 761 P.2d at 358. Dawson can show no prejudice as a result of his counsel's failure to raise this version of the issue on direct appeal, because arguing a due process violation instead of an impartial jury violation would have made no difference. The outcome was based on the conclusion that the trial court's reaction did not prejudice Dawson.

¶155 Finally, Dawson contends that his appellate counsel should have argued on direct appeal that the "inflammatory comments of the prosecutor during closing argument" were improper and prejudicial. As previously discussed, Dawson's trial counsel made a reasonable strategic choice not to object to the prosecutor's reference to the "killing pen." As a result, Dawson's appellate counsel was precluded from raising this issue because trial counsel did not object at trial. Moreover, as concluded by the District Court "such

references would not have been grounds for a mistrial," and thus, Dawson can show no prejudice from failure to raise this issue on direct appeal.

¶156 Accordingly, we conclude that the District Court did not err when it found that Dawson did not receive ineffective assistance of counsel at the direct appeal phase.

¶157 In conclusion, we agree with the sentiments of the District Court regarding Dawson's ineffective assistance claims at the pretrial, trial, sentencing, and direct appeal phases of the proceedings against him:

> [T]he Court finds that Dawson was afforded a trial with reliable results. There was no breakdown in the adversary process in this case. Evidence of Dawson's guilt was overwhelming. If minor errors were made in the trial process they did not prejudice the finding of guilt or the imposition of the death penalty . . . . Claimed criticism today of the conduct of counsel at trial and appeal is certainly utilizing the "distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct" and does not "evaluate the conduct from counsel's perspective at the time" as prohibited by *Strickland*, 466 U.S. at 689.

¶158 Moreover, in response to the attorney affidavits submitted by Dawson, we point out the following passage from *Strickland*: "[t]here are countless ways to provide effective assistance in any case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

## ISSUE 5

¶159 Did the District Court err when it denied Dawson's claims 1-29 by summary judgment?

¶160 We review district court orders granting summary judgment, as we do district court conclusions of law, to determine if they are correct. *See Vernon Kills on Top v. State* (1996), 279 Mont. 384, 390, 928 P.2d 182, 186.

¶161 Section 46-21-105, MCA, provides the following, in relevant part:

> (2) When a petitioner has been afforded the opportunity for a direct appeal of the petitioner's conviction, grounds for relief that were or could reasonably have been raised on direct appeal may not be raised, considered, or decided in a proceeding

brought under this chapter.

(3) For purposes of this section, "grounds for relief" includes all legal and factual issues that were or could have been raised in support of the petitioner's claim for relief.

¶162 In *Hagen v. State*, 1999 MT 8, ¶ 13, 293 Mont. 60, ¶ 13, 973 P.2d 233, ¶ 13, we stated:

The doctrine of *res judicata* also may pose a procedural bar to postconviction relief. Under that doctrine, claims which were raised on direct appeal are barred from being raised again in a petition for postconviction relief. Furthermore, the doctrine of *res judicata* is similar in effect to § 46-21-105(2), MCA (1995), in that it bars postconviction claims which "could have been raised on direct appeal."

(Citations omitted.)

¶163 Dawson argues that three of his claims for relief in his second amended petition for postconviction relief could not have been raised on direct appeal because they required evidence not found in the record and, therefore, they should not have been dismissed by summary judgment. Dawson cites to *State v. Bromgard* (1995), 273 Mont. 20, 23, 901 P.2d 611, 613, where we stated that we will not consider, on appeal, facts that are not found in the record.

¶164 In its response to Dawson's motion for reconsideration of nine claims, which Dawson argued required facts on appeal that were not in the record, the District Court concluded that:

[T]he issues raised in these claims could have been raised on direct appeal. Also, if a defendant fails to preserve an issue for direct appeal by making an appropriate objection at the trial stage it will be barred by Section 46-21-105(2) M.C.A. State v. Gorder, 243 Mont. 333, 334-35, 792 P.2d 370, 371 (1990).

¶165 First, Dawson asserts that the following claim, his 10th Claim for Relief, should not have been dismissed because it would have required evidence not found in the record:

The State denied Petitioner the ability to obtain evidence in mitigation of guilt or

punishment by failing to draw Petitioner's bodily fluids until 12 hours after his arrest, sufficient time for evidence of his ingestion of drugs and/or alcohol during the time of the offense to be lost . . . .

¶166 On appeal, Dawson fails to set forth any reason why this claim would have required eveidence not found in the record. However, in his brief in opposition to the State's motion for summary judgment, Dawson argued that: "claim 10 requires examination of the extent and reasons for delay in taking Petitioner's blood sample following arrest."

¶167 Our review of the trial transcript reveals that this claim would not have required evidence other than that found in the record on appeal. Officer Gary Hatfield testified regarding his receipt of a search warrant to obtain blood and urine samples from Dawson on Sunday, April 20. Officer Hatfield testified that he was required to wait approximately two hours at the hospital, while the hospital's legal staff checked on the search warrant, before the hospital was able to obtain the blood and urine samples. Moreover, there was no objection at the trial level and thus, Dawson failed to preserve this issue for direct appeal.

¶168 Second, Dawson asserts that the following claim, his 20th Claim for Relief, should not have been dismissed because it would have required additional evidence:

> The trial court's findings and conclusions were drawn, whether directly or indirectly, from the findings in State v. Ronald Smith, and were not based upon the precise facts in the case before the court. The matters of aggravation and mitigation were merely enumerated, and not considered, by the trial court.

¶169 In response, the State points out that Dawson failed to argue to the District Court that this claim could not be raised on appeal because it required additional evidence. Dawson's brief in opposition to the State's motion for summary judgment states that: "Claims 4, 5, 7, 10, 11, 19, 22, 23, 27 all require evidence outside the record or trial proceedings." Additionally, in Dawson's motion for reconsideration of the District Court's award of partial summary judgment, Dawson did not argue that his 20th claim for relief required evidence outside the record.

¶170 "It is axiomatic that a party may not change the theory on appeal from that advanced in the district court." *State v. Henderson* (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016. Accordingly, because Dawson did not argue this theory to the District Court, we

will not address this issue on appeal.

¶171 Finally, Dawson asserts that the following claim, his 27th Claim for Relief, should not have been dismissed because it would have required evidence outside the record:

> The state failed to disclose to the defense the results of the testing done on Petitioner's blood, drawn the day of his arrest, showing that Petitioner had ingested marijuana and methamphetamine.
>
> The state failed to disclose to the defense the complete records from Petitioner's pre-trial mental evaluation at Warm Springs hospital which records contained the two EEG reports, both of which were abnormal, contradicted the testimony heavily relied upon by the state that Petitioner failed to exhibit concern for the charges against him . . . .

¶172 As we noted previously, defense counsel either had this information or the lack of information was not prejudicial to Dawson.

¶173 Accordingly, we conclude that the District Court properly applied the procedural bar of § 46-21-105(2), MCA, to Dawson's claims for relief, 10 and 20, and that there was no prejudice from applying the procedural bar to claim 27. Therefore, we further conclude that the District Court properly dismissed Dawson's claims 1-29 in his petition for postconviction relief by summary judgment.

## ISSUE 6

¶174 Should this Court, in a postconviction proceeding, reconsider issues it has already decided on direct appeal?

¶175 Dawson asserts that this Court's decision in *Vernon Kills on Top v. State* (1996), 279 Mont. 384, 928 P.2d 182, directly supports the reconsideration of claim 18, consideration of aggravating circumstances; claim 22, trial court's reaction denied due process; and claim 24, denial of a jury trial on aggravating circumstances, all of which the District Court dismissed by partial summary judgment after it concluded that these issues had been raised on direct appeal and were barred by res judicata. Dawson contends that our decision in *Vernon Kills on Top*, requires that the District Court consider whether the "ends of

justice" would be served by reconsideration of these claims in a petition for postconviction relief.

¶176 In *Vernon Kills on Top*, we set forth the criteria for the application of the doctrine of res judicata to the relitigation of issues already determined on direct appeal, stating that we will apply the procedural bar if:

> (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Vernon Kills on Top*, 279 Mont. at 399, 928 P.2d at 192.

¶177 In *Vernon Kills on Top*, we held that:

> In this case, we conclude that, with the exception of those claims which challenge the imposition of the death sentence based on disproportionality pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, and Article II, Section 22, of the Montana Constitution, the ends of justice are not served by reaching the merits of the petitioner's claims a second time. . . . To the contrary, the "ends of justice" do compel reconsideration of the petitioner's death sentence in light of this State's constitutional prohibition against the infliction of cruel or unusual punishments.

*Vernon Kills on Top, 279 Mont. at 399-400, 928 P.2d at 192.*

¶178 Additionally, Dawson contends that because we applied the "substantial evidence" standard of review to uphold the trial court's findings on Dawson's direct appeal, a standard of review which Dawson argues we subsequently repudiated in *Vernon Kills on Top*, we should reconsider his claims regarding evidence to support torture and lying in wait under the clearly erroneous standard.

¶179 In this case, Dawson has presented no evidence that the "ends of justice" would be served by reconsidering these claims, nor do we conclude that the "ends of justice" compel us to reconsider any of Dawson's claims. Accordingly, we conclude they are barred by principles of res judicata.

¶180 In conclusion, we affirm the decision of the District Court denying Dawson's second Amended Petition for Postconviction Relief.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART