

DA 13-0561

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 141

GARRY DAVID GOLDEN,

        Petitioner, Appellant and Cross-Appellee,

  v.

STATE OF MONTANA,

        Respondent, Appellee and Cross-Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 08-1835
Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                David Rice, Clinical Professor of Law, Jacob Yerger, F. Peter Landsiedel, Clinical Interns, School of Law, University of Montana, Missoula, Montana

        For Appellee:

                Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman, Assistant Attorney General, Helena, Montana

                Scott Twito, Yellowstone County Attorney, Rod Souza, Deputy County Attorney, Billings, Montana

        For Amicus Curiae:

                Colin M. Stephens, Montana Innocence Project, Smith, & Stephens, P.C., Missoula, Montana

                                Submitted on Briefs:  April 23, 2014
                                           Decided:  June 3, 2014

Filed:

                              _____
                                         Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 In March 2005, Garry Golden was found guilty of felony sexual assault. He was sentenced to serve 20 years under the supervision of the Montana Department of Corrections with 15 years suspended. Golden appealed his conviction and in September 2007, we affirmed. In December 2008, he filed a petition for postconviction relief in the Thirteenth Judicial District Court, Yellowstone County, seeking DNA testing and relief from an asserted ineffective assistance of counsel (IAC) claim. The District Court denied the petition as untimely. In September 2009, we reversed and remanded the matter for review on the merits.

¶2 In June 2010, Golden filed a second petition with the District Court requesting that he be allowed to conduct discovery. The State moved to dismiss Golden's petition for postconviction relief and filed a memorandum opposing Golden's motion for leave to conduct discovery. In June 2013, the District Court denied Golden's petition for DNA testing, his request to conduct discovery, and the State's motion to dismiss. The court granted Golden's petition for postconviction relief as it pertained to his IAC claim. Golden appeals the District Court's denial of his petition for DNA testing and the State cross-appeals the District Court's grant of Golden's petition for postconviction relief on his IAC claim. We affirm in part and reverse in part.

## ISSUES

¶3 The issue on appeal is whether the District Court erred in denying Golden's petition for DNA testing.

2

¶4     The issue on cross-appeal is whether the District Court erred in granting Golden's petition for postconviction relief.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     Garry Golden and Martin Holland were close friends, describing each other as "family." The two men even moved to Montana together in late 2001 or early 2002. They lived and worked together. Shortly after arriving in Montana, Holland met L.W. L.W. had two young children, daughter K.W. and son P.W. Holland subsequently moved in with L.W. and the children and over time established a common law marriage. Golden also moved into the mobile home with L.W., Holland, and the children for several weeks until he was able to find another place to live.

¶6     Holland and L.W. maintained a close relationship with Golden and allowed him almost unlimited access to their car and home by providing him with keys to both. Golden visited daily. On August 13, 2002, Golden visited Holland while L.W. was at work. Golden had been drinking and, according to Holland, appeared intoxicated. The children were at home and three-year old P.W. was walking around naked in the heat. Holland and Golden spent some time on the computer then Holland excused himself to "rest." Holland testified that because Golden was drunk and "smelled," he did not want to spend more time with him. Rather than leaving, however, Golden remained in the living room with P.W. and four-year old K.W.

¶7     Approximately one-half hour later, Holland emerged from the bedroom and witnessed Golden performing oral sex on P.W., who was reclining across Golden's lap. Holland testified that while shocked, he was 100% positive of what he saw. He ordered Golden to

3

leave and to leave the keys to the trailer home and the car on his way out. Golden told Holland he was sorry and left.

¶8 Shortly thereafter, Paul Foster, a neighbor and mutual friend of Golden and Holland, stopped by and found a "stunned" and "truly shocked" Holland. After discussing the events with Foster, Holland called L.W. at work and asked her to come home immediately. When L.W. arrived at approximately 9:15, Holland told her what had happened. After confirming that P.W. was unharmed, L.W. called the police. An officer took statements from Holland, Foster, and L.W. and recommended that they take P.W. to the hospital to have him "checked out." L.W. found some already-worn underpants on P.W.'s bedroom floor, put them and other clothes on him and took him to the hospital at around midnight.

¶9 At the hospital, L.W. explained that the child had been orally sexually assaulted earlier in the evening according to Holland who had witnessed the assault. L.W. did not identify Golden and admitted that she was not home at the time. Based upon L.W.'s explanation of why P.W. needed to be examined, the doctor took swabs from his penis and scrotum and retained his underpants for analysis. The underwear and the swab samples were sent to the Montana State Crime Laboratory to be analyzed for saliva DNA.

¶10 Meanwhile, officers went to Golden's home and arrested him. During questioning, Golden admitted visiting Holland's trailer, being intoxicated and continuing to drink while at Holland's, remaining with the children after Holland left the room, and holding unclothed P.W. on his lap. He denied performing oral sex on P.W. but stated that it was "unlikely, but possible" that he had done something wrong that he did not remember.

4

¶11 The laboratory could not identify Golden's DNA on the sample swabs or P.W.'s underwear. Following a trial in 2004, the jury was unable to reach a verdict and a mistrial was declared. At a second trial in 2005, at which Holland, L.W., Foster, and the examining physician testified, Golden objected to hearsay testimony from the latter three witnesses. The District Court overruled his objections. The jury reached a guilty verdict and Golden appealed on the ground that inadmissible hearsay had been erroneously admitted. As noted above, in 2007 we affirmed Golden's conviction. *State v. Golden*, 2007 MT 247N (*Golden 1*).

¶12 In December 2008, Golden filed a postconviction petition. In this petition, he claimed he had received ineffective assistance of counsel and he asked for postconviction DNA testing. The District Court dismissed Golden's petition on procedural grounds and we reversed and remanded the matter for consideration of the petition on the merits. The State sought to dismiss the petition and Golden subsequently moved for leave to conduct discovery. In June 2013, the District Court denied Golden's petition for DNA testing, his motion for leave to conduct discovery, and the State's motion to dismiss. The court granted Golden's petition as it pertained to his claims of IAC.

¶13 Golden filed a timely appeal and the State cross-appeals.

**STANDARD OF REVIEW**

¶14 A district court's decision regarding postconviction DNA testing under § 46-21-110, MCA, constitutes a mixed question of fact and law, which we review de novo. *Haffey v. State*, 2010 MT 97, ¶ 9, 356 Mont. 198, 233 P.3d 315.

¶15 In considering ineffective assistance of counsel claims in postconviction proceedings, we apply the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *See Hagen v. State*, 1999 MT 8, ¶ 10, 293 Mont. 60, 973 P.2d 233. *Strickland's* two-part test requires the defendant to show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. A petitioner must establish both prongs of the *Strickland* test. We need not address both prongs if a petitioner fails to establish either prong. *State v. Mederos*, 2013 MT 318, ¶ 12, 372 Mont. 325, 312 P.3d 438.

¶16 A deficient performance falls "below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Mederos*, ¶ 13. A petitioner must overcome the presumption that under the circumstances the action he challenges might be considered sound trial strategy. Counsel's trial strategies are entitled to great deference when reviewed on a claim of IAC. *State v. Whitlow*, 2001 MT 208, ¶ 17, 306 Mont. 339, 33 P.3d 877.

¶17 As for the second prong of *Strickland*, a petitioner alleging ineffective assistance must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional

6

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

**DISCUSSION**

¶18    *Did the District Court err in denying Golden's petition for DNA testing*?

¶19    Golden petitioned the District Court for additional DNA testing because the DNA testing performed at the time of the accusation did not detect Golden's saliva DNA on either P.W. or P.W.'s underwear. He asserted that the DNA actually found on P.W.'s underwear (this unidentified DNA is referred to as the "unknown contributor" DNA) should be further tested and compared to the DNA of Holland and Foster and against the CODIS[1] program containing databases of known criminals. He also argued for "substrate control" testing of P.W.'s underwear, claiming such testing should have been performed initially but was not.

¶20    In considering Golden's petition for additional DNA testing, the District Court relied upon § 46-21-110(5)(e), MCA, and *Haffey,* ¶ 18. It concluded based upon these authorities that it must determine whether or not further DNA testing would potentially exonerate Golden. The court noted that the minor amount of DNA belonging to an unknown contributor and detected on P.W.'s underwear could be attributed to any number of sources given that the underwear had been on the floor for an undetermined amount of time and there was no way of knowing who had come in contact with it.

---

[1]    CODIS, the acronym for the Combined DNA Index System, is "the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases." FBI website at http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet.

¶21 The court reviewed the record and the pleadings and determined that "[e]ven if the unknown contributor were identified, it would not make it any less likely that [Golden] committed the assault against the victim, or any more likely that someone else did." The District Court concluded that further DNA testing would not exonerate Golden in light of the State's strong eyewitness evidence and Golden's own incriminating statements made after the incident.

¶22 On appeal, Golden argues that the District Court misapplied the *Haffey* test. In *Haffey*, Haffey admitted to and was convicted of felony assault with a weapon and DUI after striking a pedestrian with his vehicle while driving intoxicated. *Haffey*, ¶ 4. After his jury conviction, he sought postconviction DNA testing in an attempt to establish that he was not driving the car at the time of the accident. *Haffey*, ¶ 6. *Haffey* is the first case this Court decided pertaining to postconviction DNA testing under § 46-21-110, MCA, which was enacted in 2003. As we noted in *Haffey*, this statute provides a procedure by which "a person convicted of a felony may seek DNA testing to show innocence." *Haffey*, ¶ 12.

¶23 Section 46-21-110, MCA, provides in relevant part:

(1) A person convicted of a felony who is serving a term of incarceration may file a written petition for performance of DNA testing, as defined in 44-6-101, in the court that entered the judgment of conviction. The petition must include the petitioner's statement that the petitioner was not the perpetrator of the felony that resulted in the conviction and that DNA testing is relevant to the assertion of innocence.
. . .
(5) The court shall grant the petition if it determines that the petition is not made for the purpose of delay and that:
(a) the evidence to be tested:
(i) was secured in relation to the trial that resulted in the conviction;

8

(ii) is available; and

(iii) is in a condition that would permit the requested testing;

(b) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, degraded, contaminated, altered, or replaced in any material aspect;

(c) the identity of the perpetrator of the felony was or should have been a significant issue in the case;

(d) the petitioner has made a prima facie showing that the evidence sought to be tested is material to the question of whether the petitioner was the perpetrator of the felony that resulted in the conviction;

(e) the requested testing results would establish, in light of all the evidence, whether the petitioner was the perpetrator of the felony that resulted in the conviction; and

(f) the evidence sought to be tested was not previously tested or was tested previously but another test would provide results that are reasonably more discriminating and probative on the question of whether the petitioner was the perpetrator of the felony that resulted in the conviction or would have a reasonable probability of contradicting the prior test results.

¶24   Addressing § 46-21-110(5)(e), MCA, we stated:

It is under this provision that a district court must weigh the exculpatory potential of DNA test results favorable to the petitioner against the prosecution's evidence presented at trial.  This is a fact-specific inquiry that will lead to a spectrum of results in different cases. For example, where "the State presented a strong case, and a favorable DNA test would discredit only an ancillary fact, the testing should be refused." . . . "At the opposite end of the spectrum, where the DNA test could exonerate the defendant, it does not matter how strong the other evidence might have been; [the statute] is satisfied." (Internal citations omitted.)

*Haffey*, ¶ 18.

¶25   Golden claims that the District Court erred when it focused exclusively on whether additional DNA testing could exonerate him.  He asserts that under the statute and extrajurisdictional cases cited in *Haffey*, additional DNA testing should be granted if he

9

presents evidence which "tends to significantly advance his claim of innocence," or "merely raises a reasonable inference of innocence." He argues that the court misinterpreted *Haffey* and the statute by requiring him to <u>prove</u> that postconviction DNA testing would completely exonerate him. (Emphasis added.)

¶26 The Montana Innocence Project (MIP) submitted an amicus curiae brief urging a liberal interpretation of the applicable statutes based, in part, upon review of the legislative history. The MIP also provided multiple statistics of the number of incarcerated persons found guilty on eyewitness testimony and subsequently exonerated by DNA evidence.

¶27 The State responds that because the plain language of the statute is clear and unambiguous, there is no reason to rely upon the legislative history. Sections 46-21-110(1)(c) and (5)(e) both require the petitioner to explain how the required testing would establish petitioner's "innocence" and "whether the petitioner was the perpetrator of the felony." The statute requires that the petitioner swear under the penalties of perjury that he is innocent and that the DNA testing would establish his innocence. Section 46-21-110(1) and (1)(c), MCA. As to the petitioner's burden, the statute requires him to make "a prima facie showing that the evidence sought to be tested is material to the question of whether the petitioner was the perpetrator of the felony that resulted in the conviction." Section 46-21-110(5)(d), MCA.

¶28 The State also argues that Golden's requests are not statutorily authorized because the statute does not contemplate collection of new biological samples from Holland and Foster. Section 46-21-110(5)(a), MCA. It does not authorize external database queries. Section 46-21-110, MCA. Essentially, the statute only authorizes the court, under certain

conditions, to order postconviction "DNA testing" of previously-secured biological evidence.

¶29 Lastly, the State maintains that DNA evidence was not what convicted Golden; rather, it was the strength of the prosecutor's case, including the strong eyewitness testimony.

¶30 We first address construction of the applicable statute. It is well-established that when interpreting a statute, legislative intent must first be determined from the plain words used in the statute. If after reviewing the plain words, confusion or ambiguity exists, we turn to the legislative history for guidance. *State v. Goebel*, 2001 MT 73, ¶ 21, 305 Mont. 53, 31 P.3d 335. In this case, the statute is clear. It requires that before a district court may authorize postconviction DNA testing, the petitioner must establish that the requested DNA testing will determine "whether the petitioner was the perpetrator of the felony that resulted in the conviction." Section 46-21-110(5)(e), MCA. He must make a prima facie showing that the evidence is material to the question of his guilt or innocence. Golden has not met the standard. It is undisputed that Golden's DNA was not found on the child or his clothing. However, the DNA test result presented at trial was outweighed by the State's evidence, including a strong eyewitness, resulting in Golden's conviction. In other words, DNA was not used to convict Golden at trial. It stands to reason that additional DNA testing would not be more favorable to Golden than the existing DNA results. Nor would the identification of the "unknown contributor" make it any less likely, based upon the evidence presented at trial, that Golden assaulted P.W.

¶31 Furthermore, it is apparent that the Legislature did not intend the statute to be used in the manner Golden seeks. The language does not authorize testing of previously untested

11

persons, nor does it contemplate a comparison of newly-obtained DNA evidence with federal information databases. It is well-established that the Court may not disregard the plain language of the statute; it must ascertain what is in "terms or in substance contained" in a statute, and not insert what is omitted or omit what is inserted. Section 1-2-101, MCA; *State v. Cooksey*, 2012 MT 226, ¶ 32, 366 Mont. 346, 286 P.3d 1174.

¶32 In its amicus brief, MIP relates that in numerous cases eyewitness testimony has been later proved to be inaccurate. Certainly this can occur in cases where the assailant was previously unknown to the victim or eyewitnesses. However, this is not a case of mistaken identity. Holland was mere feet away from Golden when he saw Golden assault the boy. Moreover, despite his denial of sexual assault, Golden corroborated every other fact Holland gave the police—time of arrival, Golden being intoxicated, the men playing games and checking e-mail on the computer, Golden's continued drinking, Holland retiring for a nap, a naked P.W. lying across Golden's lap, and Golden's apology to Holland on the way out the door. He stated he knew of no reason why Holland would lie about this. He acknowledged that he was drunk when it happened and "[i]t is unlikely but possible that I did something that I don't remember." The jury was persuaded by the State's evidence and convicted him. For these reasons, and because the DNA tests requested by Golden are not authorized under the language of the statute, we conclude the District Court did not err in denying Golden's petition.

¶33 *Did the District Court err in granting Golden's petition for postconviction relief?*
*Ineffective assistance of trial counsel*

12

¶34 Golden alleged in his petition for postconviction relief that his trial counsel—in both his first and second criminal jury trials—failed to consult with or employ a DNA expert. He posited that the absence of such an expert constituted deficient performance by counsel and prejudiced his defense.

¶35 The District Court relied upon the two-prong test set forth in *Strickland*. Under this test, Golden was required to establish that his trial counsel's performance was deficient and that the deficiency prejudiced his defense. *See* Op. ¶ 15.

¶36 As the District Court noted, Golden's counsel explained in an affidavit that he had consulted with a DNA expert but chose not to call the witness to the stand after learning that the DNA tests had excluded Golden as a DNA contributor. Counsel was concerned that having the expert on the stand could potentially "open the door to other issues," that may prove disadvantageous to Golden. Therefore he made the strategic decision to exclude the DNA expert from the witness list.

¶37 The court concluded that Golden did not establish that trial counsel's performance was deficient, *i.e.*, he did not satisfy the first prong of the *Strickland* test. Consequently, the District Court denied Golden's petition as it applied to trial counsel IAC. We affirm the District Court's ruling as to this issue. There was no reason to call a defense DNA expert when the DNA results were favorable to Golden. As discussed above, reasonable trial strategy decisions cannot be the basis for a finding of ineffective assistance. *Whitlow*, ¶ 17. Because Golden did not satisfy the first prong of *Strickland*, we need not address the second prong. *Mederos*, ¶ 12.

*Ineffective assistance of appellate counsel*

¶38 Golden also claimed in his petition for postconviction relief that his appellate counsel did not adequately brief his claim that inadmissible hearsay had been introduced during his trial. He argued that counsel failed to comply with M. R. App. P. 23(a)(4)(2005)[2] because she neglected to set forth the required legal argument with supporting authority in Golden's opening brief on appeal. He asserts this constituted ineffective assistance and that he was prejudiced because this Court did not reach the merits of his hearsay claim in *Golden 1*.[3]

¶39 In reliance upon *Strickland*, the District Court determined that Golden had presented a sound argument that inadmissible hearsay had been admitted, and that counsel's "unsatisfactory brief" in addressing the hearsay claim constituted deficient performance. The court concluded that without a proper legal argument in the brief, this Court was unable to review the issue on appeal, resulting in procedural prejudice to Golden. The District Court granted Golden's motion for postconviction relief on the issue of appellate counsel's IAC and ordered that Golden receive a new appeal of his trial court conviction.

¶40 On cross-appeal, the State asserts that the District Court erred in granting Golden's petition on this issue. It argues that the hearsay admitted at trial fell within recognized statutory exceptions and therefore was not inadmissible. In the alternative, the State submits that even if the statements were inadmissible, it was harmless error to admit them in that they were cumulative and did not contribute to Golden's conviction in light of Holland's "unequivocal testimony under oath."

---

[2] Renumbered M. R. App. P. 12(1)(f)(2007).
[3] In *Golden 1*, a non-citable opinion, we chastised appellate counsel for failing to comply with M. R. App. P. 23(a)(4). As a consequence, we held that Golden had not

14

¶41 The State also argues that the District Court did not conduct an appropriate prejudice analysis under prong two of *Strickland*. It claims that had the court applied the prejudice standard, it would have concluded that Golden failed to show "a reasonable probability that he would have prevailed on his direct appeal but for counsel's failure to brief the issues differently." Stated otherwise, he could not show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, 10 P.3d 49.

¶42 Golden counters with a detailed argument that the hearsay statements admitted at trial did not satisfy the claimed hearsay exceptions, and that appellate counsel did not include a proper hearsay analysis in Golden's briefs nor did she argue that the admission of the testimony prejudiced Golden.

¶43 We conclude that we need not determine whether the hearsay statements were inadmissible because these statements were cumulative and constituted harmless trial error under *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735. In *Van Kirk*, we endorsed a "cumulative evidence" test under which we determine whether the fact-finder was presented with admissible evidence that proved "the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43.

¶44 The ostensibly tainted hearsay evidence consists of certain testimony given by Foster, L.W., and the doctor who examined the child at the hospital. Foster and L.W. each testified that it was related to them by Holland that Golden had sexually assaulted the child. The

established that the District Court had committed error in admitting the challenged statements and we affirmed his conviction.

treating physician testified that L.W. told her the child had been sexually assaulted but that L.W. did not identify the perpetrator. All three witnesses admitted that they had no first-hand knowledge of the event. Their statements merely parroted Holland's unequivocal testimony regarding the assault he witnessed in his living room. Thus, the jury was presented with admissible eyewitness testimony by Holland that proved "the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43.

¶45    In *Van Kirk*, we stated that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." *Van Kirk*, ¶ 29. We explained that "error is prejudicial, and requires reversal, if a reasonable possibility exists that the inadmissible evidence might have contributed to a conviction." *Van Kirk*, ¶ 29. Noting a distinction between "structural" errors committed in criminal trials and the "more typical 'trial' error," we ruled that "[t]rial error is not presumptively prejudicial and therefore not automatically reversible, and is subject to review under our harmless error statute . . . ." *Van Kirk*, ¶ 40.

¶46    In concluding that appellate counsel rendered ineffective assistance for her failure to present an appropriate legal argument on the hearsay issue, the District Court found that the first prong of *Strickland* was met; however, it did not reach the second prong. We reach that prong here. The truly damning evidence against Golden was Holland's unequivocal eyewitness testimony, presented under oath. In view of this strong direct evidence, we cannot conclude that admission of the objectionable statements contributed to Golden's conviction. We therefore conclude that if indeed erroneous, the admission of the hearsay testimony was harmless error under the circumstances of this case. This being so, we further

conclude that had appellate counsel adequately briefed the hearsay issue on direct appeal, there is no reasonable probability that the outcome of the appeal would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

## CONCLUSION

¶47     For the foregoing reasons, we affirm the District Court's denial of Golden's petition for postconviction DNA testing and reverse the court's grant of his petition as it pertains to IAC of appellate counsel.

/S/ PATRICIA COTTER


We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JIM RICE

17