

FILED
07/06/2021
Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA
Case Number: DA 19-0157

DA 19-0157

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 165N

STATE OF MONTANA,

Plaintiff and Appellee,

v.

JACQUELINE BLACK,

Defendant and Appellant.

FILED

JUL 0 6 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM: District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DC-16-58
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Ryan P. Archibald, Bitterroot Law, PLLC, Hamilton, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

Kathryn McEnery, Powell County Attorney, Deer Lodge, Montana

Submitted on Briefs: March 3, 2021

Decided: July 6, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Jacqueline Black appeals from her conviction by a jury of the offense of conspiracy to commit transferring illegal articles, a felony pursuant to §§ 45-4-102 and 45-7-307, MCA. We affirm.

¶3 Black was charged with attempting to transport illegal articles into Montana State Prison (MSP) along with two co-conspirators. Between February and March 2014, Black communicated over 30 times with Terry Lloyd Cowan (Cowan), an inmate at MSP, often discussing Suboxone and its transport into MSP. On March 6, 2014, Cowan received a package with what was later identified by the crime lab as Buprenorphine/Naloxene, commonly known as Suboxone, a dangerous drug pursuant to § 50-32-226(2)(g), MCA. On March 9, 2014, Black attempted to visit Cowan but was not permitted entrance. Black was subsequently charged.

¶4 Previously Black had been on probation for other charges, and on October 16, 2017, the parties signed a stipulation agreeing not to discuss Black's prior bad acts at trial. The District Court ordered that the parties refrain entirely from presenting any evidence on

2

"[a]ny wrongful act, allegation of misconduct, warrant, arrest, charge, or conviction of [Black] for which she is not charged in this case."

¶5 On June 4, 2018, the State filed a trial brief which included its exhibit list. The State planned to introduce as evidence the visitor log that Black signed when she attempted to visit MSP. The log listed Black's prior felony conviction, and the State offered to redact that portion. The State asserted "Defendant has not indicated it wishes any of the evidence – including the recorded phone calls – redacted, and the State intends on playing them in their entirety." Defense counsel did not respond.

¶6 In a pretrial conference, the District Court discussed the audio recordings and possible prejudice to Black. The court stated, "We have a stipulation. We're not going to hear about any other convictions or anything else. We've agreed to that, right?" The State responded,

> [Your] honor there is reference to it in these audio recordings as I've uh, restated in the Pre-Trial Conference um, however, I've done my best to um, mitigate that in the timeframes I'm intending on playing. Um, it doesn't specifically list uh, what Ms. Black was in custody for in-- under probation for I think is actually the um, phrase.

The State also responded that it had redacted Black's felony reference on the visitor log for MSP. Defense counsel stated that he knew what the audio tapes contained and had no objections to what the State was going to play for the jury regarding Black.

¶7 In opening statements, the State explained that Cowan and Justin Basaraba (Basaraba) conspired with Black to transport drugs into MSP. The State told the jury that Cowan and Basaraba would both be witnesses at trial. Basaraba agreed to testify for the State in exchange for dismissal of the charge he faced as a co-conspirator. Cowan was still

in prison and initially agreed to testify for the State. The State advised the jury to pay close attention to the demeanor of the co-conspirators and consider their motivations in testifying. The evidentiary basis for conviction, the State explained, would be based on the contents of recorded phone calls and Black's visits to the prison. Defense counsel explained that the package Cowan received with Suboxone had a return address to Kelly Clarkson, and that Cowan and Black were friends but that Basaraba never met Black.

¶8 Once he was on the stand, Cowan stated that he was advised by an attorney not to testify and he therefore refused to testify. Basaraba testified that he and Cowan were cellmates at MSP, and while there, Cowan taught him how to transport Suboxone by mail. Basaraba testified about the method that Cowan taught him and explained, "[t]o unglue the bottom flap of a manila mailing envelope and re-glue it with the Suboxone strips in there and then send it in." Cowan also told Basaraba about his friend Black. Basaraba testified that Cowan referred to Black as both "Jackie" and "Jacqueline."

¶9 Once Basaraba was released from MSP, Cowan called him to request he assist in transporting Suboxone into MSP. Cowan wanted Basaraba to explain to Black how to transport Suboxone by mail. Cowan communicated this to Black on a recorded line many times, including asking her repeatedly to contact Basaraba for instructions. Basaraba subsequently spoke with a person who identified herself as Black and relayed the instructions from Cowan on how to transport Suboxone. On cross-examination Basaraba said that he did not know whether the person he spoke to on the phone was Black, or just someone using her name as he had never met her in person. He also explained that on the recorded calls with Cowan, Cowan called Suboxone "strippers".

4

¶10 The State presented the audio recordings of Black speaking with Cowan as well as recordings of Cowan speaking with Basaraba. Cowan and Basaraba spoke about Suboxone, although as Basaraba testified, Cowan often referred to Suboxone as "strippers." They discussed planning to transport Suboxone into MSP. In the recording of the initial call the State presented, Basaraba did not understand what Cowan was asking him to do when he referred to "strippers," but Cowan explained by describing the "strippers" they had in Shelby on one occasion. Basaraba then recognized what Cowan was speaking about and mentioned that the "strippers" had "beading patterns." At that point Basaraba agreed to explain to Black how to "get it all ready," referring to sending Suboxone.

¶11 Basaraba and Black did not connect for some time and Cowan called Basaraba repeatedly to ask whether he had spoken with Black. Eventually Basaraba and Black connected, and Cowan confirmed by thanking him for "telling [Black] how to do that." Basaraba told Cowan that it was no problem and asked if it worked out all right. Cowan responded happily with laughter.

¶12 The recordings confirm that Cowan asked Black to contact Basaraba. Initially Black did not understand what Cowan was asking her to do, and Cowan assured her that once she received the letter he had sent and after she spoke to Basaraba she would understand. Cowan grew increasingly agitated that Black had not reached out to Basaraba. Cowan and Black also discussed Black's recent probation and related treatment. Defense counsel did not object to the admission of any of the recordings at trial.

5

¶13 Testimony from an investigator and a mailroom supervisor from MSP corroborated that Suboxone was sent to Cowan, that Black visited Cowan twice, and that Black and Cowan spoke on the phone over 30 times.

¶14 In closing arguments, defense counsel argued that the State did not provide evidence to prove that Black was actually the one who sent the envelope with Suboxone to Cowan. The State did not check for DNA on the envelope, nor did they analyze the handwriting, and the return address on the envelope said it came from Cowan's sister's house. At the conclusion of the trial, the State presented the Court with over 20 proposed jury instructions including one that stated that Cowan was Black's co-conspirator and was charged for that crime. Defense counsel did not object to that instruction and declined to present any jury instructions.

¶15 Black argues on appeal that the State committed prosecutorial misconduct by presenting evidence of her prior bad acts at trial after stipulating not to do so. Section 46-20 104(2), MCA, bars review of alleged errors not objected to at trial. Thus, we decline to review the claim here.

¶16 Black argues further that her counsel was ineffective because he failed to present the jury instructions that he was obligated to present regarding co-conspirator testimony.

¶17 Section 26-1-303(4), MCA, requires that "the jury is to be instructed by the court on all proper occasions that . . . the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust." *State v. Kougl*, 2004 MT 243, ¶ 20, 323 Mont. 6, 97 P.3d 1095; *State v. Rose*, 1998 MT 342, 292 Mont. 350, 972 P.2d 321.

6

¶18 Moreover, a co-conspirator's testimony must be corroborated with other evidence pursuant to § 46-16-213, MCA, which states:

> A person may not be found guilty of an offense on the testimony of one responsible or legally accountable for the same offense, as defined in 45-2-301, unless the testimony is corroborated by other evidence that in itself without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense.

If counsel requests jury instructions that are required by statute, the district court is obligated to grant the request. *Kougl*, ¶ 17; *Rose*, ¶ 18; *see also* § 26-1-303, MCA. Counsel can be found ineffective when they fail to ask the jury to be instructed to view a legally-accountable person's testimony with suspicion when they have no plausible justification not to do so. *Kougl*, ¶ 17 (*citing Rose*, ¶ 20).

¶19 In *Kougl*, we held that where the parties agreed that the defendant had accomplices, their status was not in dispute, and therefore they were accomplices as a matter of law. *Kougl*, ¶ 20 (citing *State v. Johnson*, 276 Mont. 447, 451-53, 918 P.2d 293, 295-96 (1996). "By failing to ask the court to tell the jurors that the law demands they view the accomplices' testimony with distrust, trial counsel failed to use the law to strike at the heart of the State's case." *Kougl*, ¶ 20. On the other hand, if the jury instruction would conflict with a defense presented, it could be tactical not to present a jury instruction about accomplice testimony. *State v. Johnson*, 257 Mont. 163, 163, 848 P.2d 499, 498 (1996), *overruled by City of Helena v. Franforter*, 2018 MT 193, 392 Mont. 277, 423 P.3d 581.

¶20 The right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment and

by Article II, Section 24, of the Montana Constitution. We use a two-prong test in evaluating ineffective assistance of counsel claims. *Heath v. State*, 2009 MT 7, ¶ 17, 348 Mont. 361, 202 P.3d 118; *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under the *Strickland* test, a party must establish that their attorney was deficient, and that the attorney's deficient performance was prejudicial and deprived the party of a fair trial. *Heath*, ¶ 17; *Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, 10 P.3d 49. The defendant must show that there is a reasonable possibility that without counsel's unprofessional errors, the result of the proceeding would have been different. *Heath*, ¶ 17 (citations omitted).

¶21 Generally, we start by asking why counsel did or did not perform as alleged and then refer to the record to answer this question. *Kougl*, ¶ 14 (citation omitted). Sometimes it is unnecessary to ask why because there is no plausible justification for what counsel did. *Kougl*, ¶ 15.

¶22 Here, the State's case did rely significantly on the fact that both Cowan and Basaraba communicated with Black about gathering drugs and transporting them into MSP. Cowan orchestrated the transport and Basaraba was key in teaching Black how to send the Suboxone. Basaraba's testimony was a major component of the State's evidence linking Black to the conspiracy and confirmed that Cowan asked Basaraba to teach Black how to mail Suboxone to Cowan in MSP and that Basaraba did so. But when Cowan refused to testify, Basaraba's testimony was the only testimony linking Black to the conspiracy and Basaraba had never met Black. After Cowan refused to testify, it is plausible that defense counsel decided to avoid bringing attention to Black as part of the

8

conspiracy. Based on the record, the defense strategy may have been that Black was not involved in the conspiracy. In any event, we do not have a basis in the record to determine whether failure to request the conspiracy-based instruction was deficient performance.

¶23 Black's counsel was not ineffective based on the record. Black can address the issue in a petition for postconviction relief with the District Court if she so chooses.

¶24 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶25 Affirmed.

_____
Chief Justice

We Concur:

_____

_____

_____

_____
Justices

9